[No. G029409. Fourth Dist., Div. Three. Sept. 30, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON MICHAEL MALFAVON, Defendant and Appellant.

**COUNSEL**

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry J. T. Carlton, Gary W. Brozio and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SILLS, P. J.**—Jason Michael Malfavon appeals from the judgment sending him to prison for 25 years to life for the death of his girlfriend's infant daughter, Kendra. A jury found he murdered the child, and, as an alternative charge, found he assaulted Kendra, resulting in her death. (See Pen. Code, §§ 187, 273ab.)[1] On appeal, he contends the evidence was insufficient to sustain the convictions. He also argues that the alternative charge of assault, resulting in death—also known as child abuse homicide—constitutes a violation of due process because it is merely a restatement of murder without the element of malice. Finally, he contends the child abuse homicide is a lesser included offense within the charge of murder, and he can only be convicted of the "greater" of the two, not both. We affirm.

### FACTS

A week before Christmas, seven-month-old Kendra was brought to the hospital by her mother, Elizabeth, and Elizabeth's boyfriend, Malfavon. Little Kendra was suffering from a severe skull fracture and brain injury, which were the cause of her death a day later. According to Elizabeth, she went to her apartment to get a few things on the night Kendra was hospitalized, as she intended to spend the night at Malfavon's apartment. While she was upstairs in her place, she left Kendra asleep in her car seat while Malfavon was seated in the backseat, although he said he was going to get out of the car and smoke a cigarette. Suddenly, Elizabeth saw Malfavon appear at the top of the stairs, holding the child who was spitting up blood. He kept repeating that she would not stop crying, although little Kendra lay silent in his arms while he said this. Elizabeth led him back to the car and drove while he held the child. Elizabeth stated she wanted to go to the hospital, but Malfavon insisted on going to his mother's home in Tustin

---

[1]Penal Code section 187, subdivision (a), states that "[m]urder is the unlawful killing of a human being . . . , with malice aforethought."

All further section references are to the Penal Code unless otherwise stated.

Section 273ab provides that "[a]ny person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life. Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187 or Section 189."

instead. When Elizabeth noticed bumps and bruises rising on the baby's head, she turned the car and drove directly to the hospital.

En route, Elizabeth questioned Malfavon, who responded that two men appeared while he was smoking a cigarette outside the car. He feared they were narcotics officers, panicked, and fled because he had been smoking methamphetamine earlier in the day.[2] When he returned, he found the baby on the floorboard of the car. Elizabeth didn't believe this story. However, she acquiesced to Malfavon's suggestion to lie to the hospital staff after he convinced her that the police would remove Kendra from her custody if they learned Elizabeth had left the baby alone in the carport. Together, Malfavon and Elizabeth fabricated a story to tell the hospital personnel, blaming Kendra's injuries on a fall from a changing table.

Detectives soon arrived at the hospital and interviewed Elizabeth and Malfavon. In this first discussion, Malfavon reported Kendra had fallen off the changing table. He soon changed his story, however, returning to his original explanation that two men, who he feared were narcotics officers, had scared him and he fled. On his return 10 minutes later, he found the baby bleeding from the mouth. Both Elizabeth and Malfavon were arrested at this point.

Eight hours later, Malfavon was at the sheriff's station and admitted that both previous stories were lies. This time he blamed Elizabeth, saying she had violently attacked the baby because Kendra was crying. He said Elizabeth had grabbed the baby by the head, banged her against the car seat, then jerked the child out of the seat, which caused the baby's head to snap back. He said Elizabeth took Kendra with her when she went upstairs, and that when he joined her, the baby had something stuffed in her mouth, which he removed.

This was not the end of Malfavon's chronicle. Two hours later, he again talked to the detectives but this time added that Elizabeth's mother was also to blame. When Elizabeth took the baby into the apartment, Elizabeth's mother hit the baby four or five times with her fist. This version was to explain the bumps and bruises on Kendra's head. After this latest story, the detectives told Elizabeth that Malfavon blamed her for the injuries. They

---

[2]Elizabeth had likewise ingested methamphetamine that day, although the two so-called adults did not smoke together. Elizabeth had taken her drugs while Malfavon was in another room. Together, they went and purchased more methamphetamine, which was taken to a friend's house and consumed by Malfavon and two friends. This was all done in the presence of baby Kendra. Elizabeth pleaded guilty to felony endangerment of a child for exposing Kendra to the methamphetamine-laced smoke and was placed on probation with a condition that she spend 107 days in jail.

then placed Elizabeth and Malfavon in a room together and surreptitiously recorded their conversation. Elizabeth asked him why he lied to the police about her involvement, and he replied that it was just a misunderstanding. He concocted an entirely new story for Elizabeth's benefit: This time he was carrying Kendra up the stairs when he tripped and fell, accidentally rolling "on top of her once or twice." After this "revelation," the detectives interviewed him *again*, and in this interview, he maintained that he was running upstairs with the baby because she was crying. En route, he accidentally slipped and fell, with Kendra hitting her head. The officers attempted to corroborate this story by examining the stairs, but there was no physical evidence of any fall on the stairs, and Malfavon carried no signs of a fall on him.

When other officers asked him about it later, Malfavon denied ever falling down stairs. When the officers reminded him of his story of the fall, he tried to backtrack, exclaiming, "Oh, yeah!"

At the carport, the officers found the pajama bottoms that Kendra had been wearing. There was blood on them and on her car seat, as well as on the outside of the passenger side door. The same blood was found on Malfavon's shirt. All of it belonged to Kendra.

Dr. Gary Goodman, the pediatric intensive care doctor treating Kendra after surgery, stated that Kendra had very severe injuries, including retinal hemorrhages common to babies who have been violently shaken. He further testified that based on the nature and extent of the injuries, they were intentionally inflicted, not accidental. According to Dr. Joseph Halka who conducted the autopsy, Kendra's cause of death was blunt force trauma to the head causing acute subdural, epidural, subarachnoid and retinal hemorrhaging. She had a fractured skull, a swollen brain, a dislodged tooth (found in her stomach) and multiple bruises. Halka opined that "this was not self-inflicted; this was not accidental nor was it suicidal. It was obviously death at the hands of another."

Elizabeth testified that Malfavon may have hurt Kendra before. There were two incidents in which she was unsure of his actions but suspected that he hit Kendra in the head once and, on another occasion, struck her leg with a wooden skewer. Elizabeth noticed that Kendra would cry whenever she saw Malfavon, and his response would be to get angry at her for crying.

At trial, Malfavon testified his memory of the night was hazy due to his methamphetamine use. He knew he took the child out of her car seat because she was crying and proceeded up the stairs. He tripped near the top, and the next thing he remembered, he was picking up the baby from the ground.

DISCUSSION

I

*Sufficiency of Evidence*

### A. Corpus Delicti Rule

Malfavon contends that without his statements, the evidence was insufficient to establish the corpus delicti. "The corpus delicti rule requires that the corpus delicti of a crime be proved independently from an accused's extrajudicial admissions. [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 364 [279 Cal.Rptr. 780, 807 P.2d 1009].) Therefore, the essence of the crime must be evident from the testimony of the prosecution's witnesses, excluding any *extrajudicial* statements by Malfavon.

The corpus delicti of any crime is defined as the combination of "(a) the fact of the injury, loss, or harm, and (b) the existence of a criminal agency as its cause." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 45, p. 250.) In essence, "[t]he corpus delicti . . . consists of at least slight evidence that somebody committed a crime." (*People v. Ochoa* (1998) 19 Cal.4th 353, 450 [79 Cal.Rptr.2d 408, 966 P.2d 442].) In a homicide case, "proof of death caused by a criminal agency" constitutes the corpus delicti. (*People v. Martinez* (1994) 26 Cal.App.4th 1098, 1104 [31 Cal.Rptr.2d 869].)

We disagree with Malfavon's contention. Kendra's death was established by the testimony of the various doctors who treated her, watched her die or performed the autopsy on her body. Moreover, the same witnesses uniformly testified that her death was caused by a criminal agency, and not by accident or suicide. In addition, Kendra's blood was found on her car seat and the car door, not on the stairs. She was left alone with Malfavon, whose shirt had Kendra's blood on it as well. There was a wealth of circumstantial evidence supporting the reasonable inference that Kendra died of an injury to her head caused by Malfavon's hitting and shaking her.

Neither the identity nor the intent of the perpetrator—much less the degree of the crime—is necessary for the corpus delicti. (See 1 Witkin & Epstein, Cal. Criminal Law, *supra,* Elements, § 45, p. 251.) Only a "slight or prima facie showing" need be made to meet the corpus delicti rule's foundation. (*People v. Jennings, supra,* 53 Cal.3d at p. 364.) " '[T]he foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency

[citation], even in the presence of an equally plausible noncriminal explanation of the event.' [Citation.]" (*People v. Ochoa, supra,* 19 Cal.4th at p. 451.)

Malfavon argues that the medical experts could not have arrived at their opinions without the benefit of his statements. The record fails to support that conclusion. The experts testified that without the *history* that was provided to them, their conclusions would have been difficult or different. However, the history included the information given by Elizabeth, not just statements made by Malfavon. His extrajudicial statements were given to the sheriff's detectives *after* the medical staff commenced their treatment of Kendra. Based on the record, it is unclear whether Malfavon's extrajudicial statements were even made to the medical staff. In addition, the witnesses were entitled to use, and rely on, whatever statements Malfavon made in court, including his unsubstantiated testimony that he fell down the stairs with Kendra.

### B. Sufficiency of Evidence for Both Charges

In the alternative, Malfavon contends that the evidence is nonetheless insufficient. He concludes that his explanation(s) of the accident was (were) the only viable one(s) provided by the record. He rejects the entire prosecution case because the doctors merely concluded that it was "unlikely" the child was injured by the fall as described by Malfavon. But there was substantial circumstantial evidence lending credible support to the inference that Malfavon was responsible for Kendra's injuries: He was left alone with the uninjured baby who was strapped into her car seat before Elizabeth went upstairs. The blood trail indicated she was injured while in the car seat by someone who then removed her from the car seat and closed the car door. And Malfavon's shirt had traces of Kendra's blood, just like those found on the car seat and the exterior of the door.

The standard for reviewing the sufficiency of evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (See *People v. Stanley* (1995) 10 Cal.4th 764, 792-793 [42 Cal.Rptr.2d 543, 897 P.2d 481].) The elements of second degree murder are: (1) an unlawful killing; (2) accomplished with malice aforethought, whether express or implied. (See *People v. Swain* (1996) 12 Cal.4th 593, 600 [49 Cal.Rptr.2d 390, 909 P.2d 994]; § 187.) The elements of assault on a child, resulting in death, are: (1) A person, having the care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death. (§ 273ab; see *People v. Preller*

(1997) 54 Cal.App.4th 93, 98 [62 Cal.Rptr.2d 507]; CALJIC No. 9.36.5 (6th ed. 1996).) ▮ As previously discussed, the evidence in support of the verdict was "reasonable, credible, and of solid value." (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) Contrary to Malfavon's protestations, his version of events was, at best, lacking in plausibility.

Malfavon also contends the evidence was insufficient to support section 273ab's element that he had "care or custody" of Kendra. Noting that the statute is unclear as to the exact definition of "care or custody," he reviews the legislative history of section 273ab, concluding that the statute was passed to protect children from "parents, daycare providers, or parental surrogates." He proposes that the evidence failed to show a sufficiently substantial relationship between Kendra and him to establish care or custody.

In *People v. Albritton* (1998) 67 Cal.App.4th 647 [79 Cal.Rptr.2d 169], the defendant attacked the child abuse homicide statute as unconstitutionally vague or overbroad, and one specific complaint was that the term "care or custody" failed to give specific and explicit notice by its absence of definition. In upholding the statute, the opinion stated that "[t]he phrase 'care or custody' in section 273ab has no special meaning 'beyond the plain meaning of the terms themselves.' (*People v. Cochran* (1998) 62 Cal.App.4th 826, 832 [73 Cal.Rptr.2d 257].) 'The terms "care or custody" . . . imply . . . only a willingness to assume duties correspondent to the role of a caregiver.' (*Ibid.*)" (*People v. Albritton, supra,* 67 Cal.App.4th at p. 657.)

Malfavon relies on five cases, each of which involved a defendant who was "substantially" more related to the child than he was to Kendra. In *People v. Cochran, supra,* 62 Cal.App.4th 826, the defendant was the "surrogate father," providing the home for the victim and the victim's mother. (*Id.* at p. 833.) In *People v. Culuko* (2000) 78 Cal.App.4th 307 [92 Cal.Rptr.2d 789], the mother of the victim-infant and the cohabiting boyfriend were convicted of the child's homicide. The evidence, much like that in Malfavon's case, consisted of testimony that the mother's boyfriend had babysat the child and had admittedly taken the responsibility for watching him the day of the death. Similarly, in *People v. Stewart* (2000) 77 Cal.App.4th 785 [91 Cal.Rptr.2d 888], the victim lived with his mother and her boyfriend, who babysat the child while the mother worked. In *Orlina v. Superior Court* (1999) 73 Cal.App.4th 258 [86 Cal.Rptr.2d 384], the defendant was the licensed daycare provider with whom the child victim was placed. Finally, in *People v. Albritton, supra,* 67 Cal.App.4th 647, the defendant was the natural father of the victim-child, and the child and its

mother resided with him. Based on the established, long-term nature of the relationships in these cases, Malfavon jumps to the conclusion that his relationship is insufficient to come within the penumbra of the child abuse statute. However, his argument fails to provide any authority to conclude that care or custody may not be established on a *less* substantial relationship.

The record supports the jury's determination that Malfavon had the care or custody of Kendra. On cross-examination, Malfavon admitted that he had the responsibility for watching Kendra while Elizabeth went upstairs to the apartment. Moreover, Elizabeth testified that she had left Kendra in Malfavon's care in the past; he had babysat for her when she suffered injuries before. The evidence was sufficient.

II

*Section 273ab and Due Process*

Malfavon contends section 273ab violates the constitutional guarantee of due process of law. He argues the statute is an unconstitutional attempt to impose a 25-year-to-life punishment on an accused without the prosecution proving malice aforethought. Emphasizing that the penalty for a violation of section 273ab is the same as that for *first* degree murder—which requires not only proof of malice but also proof of premeditation and deliberation—he postulates that the state is undermining the most rudimentary protections of due process.

We reject Malfavon's contentions. In *Williams v. Oklahoma* (1959) 358 U.S. 576 [79 S.Ct. 421, 3 L.Ed.2d 516], the United States Supreme Court established "the Due Process Clause of the Fourteenth Amendment does not, nor does anything in the Constitution, require a State to fix or impose any particular penalty for any crime it may define or to impose the same 'proportionate' sentences for separate and independent crimes." (*Id.* at p. 586 [79 S.Ct. at p. 427].) A state legislature has the sole discretion to determine the appropriate penalty for state crimes, within the confines of the Eighth Amendment's protection against cruel and unusual punishment.

In addition, a state legislature has the power to define the elements of its crimes because " '[p]reventing and dealing with crime is much more the business of the States than it is of the Federal Government . . . . [I]t is normally "within the power of the State to regulate procedures under which its laws are carried out," . . . and its decision in this regard is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be

ranked as fundamental." ' [Citation.]" (*Montana v. Egelhoff* (1996) 518 U.S. 37, 43 [116 S.Ct. 2013, 2017, 135 L.Ed.2d 361].)

Prescribing punishment for various forms of homicide is distinctly within the police power of the states, as is the definition of the elements of crimes and the delineation of their punishments. (*Montana v. Egelhoff, supra,* 518 U.S. at p. 57 [116 S.Ct. at p. 2024] (conc. opn. of Ginsburg, J.); see also *Berman v. Parker* (1954) 348 U.S. 26, 32 [75 S.Ct. 98, 102, 99 L.Ed. 27] ["Public safety, public health, morality, peace and quiet, law and order— these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs."].) ▮ And, most importantly, the burden is on the party alleging the due process violation to prove that the right or procedure violated by the state "is ' "so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' [Citation.]" (*Montana v. Egelhoff, supra,* 518 U.S. at p. 47 [116 S.Ct. at p. 2019].)

▮ The basic premise of Malfavon's argument, which assumes that *only* first degree murder carries a term of 25 years to life, is not true. For example, under section 667, subdivision (e)(2)(A), *any* felony committed by a felon previously convicted of two serious or violent felonies is to be punished by *at least* 25 years to life in prison. Likewise, a kidnapping during which the victim sustains bodily injury is punished by a life term without the possibility of parole, a substantially *greater* punishment than that prescribed for assaulting a child with the result of death. (See § 209, subd. (a).) Various other crimes carry the same heavy penalty, such as the killing of a public transit employee (§ 190.25, subd. (a)), the killing of a peace officer (§ 190, subd. (b)), and setting a bomb or obstruction on a train track *not* resulting in death (§ 218). None of these crimes requires proof of express malice, much less premeditation and deliberation, yet the punishment imposed for them has been repeatedly upheld.

Likewise, Malfavon relies on his own "historical analysis" of California laws, concluding that prosecutors have always been required to prove malice aforethought before the punishment for murder has been permitted. That is simply inaccurate. For instance, section 218, which has been on the books since 1891, permits imprisonment for life *without* the possibility of parole although neither an unlawful killing nor express malice is required in its proof.

Alternatively, Malfavon invokes language from *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] to decry the punishment he received. In *Ireland,* the assault offense was "merged"

with the resulting homicide, and Malfavon contends it should be merged in his case as well.

In *Ireland*, the California Supreme Court barred application of the felony-murder rule to an assault that resulted in a death. However, Malfavon's manipulation of the *Ireland* "merging" rule requires his taking the language out of context. *Ireland* did not involve a criminal statute enacted by the Legislature; it involved a prosecution for murder under the felony-murder rule when the underlying felony triggering it was only an assault. The *Ireland* opinion barred such a prosecutorial expansion of the felony-murder rule. (See also *People v. Hansen* (1994) 9 Cal.4th 300, 311-312 [36 Cal.Rptr.2d 609, 885 P.2d 1022]; see also *People v. Stewart, supra,* 77 Cal.App.4th at pp. 797-798 [the *Ireland* merging rule undermined any need for the court to sua sponte instruct on second degree murder in a § 273ab prosecution].)

In contrast, we are not dealing in the case before us with the prosecutorial exploitation of a legal mechanism that the Legislature failed to authorize by statute. To the contrary, the Legislature has specifically given its imprimatur through enactment of section 273ab.

Malfavon then focuses on the Legislature's *motivation* behind the passage of section 273ab in 1993, as expressed in an analysis by the Senate Committee on Judiciary. In that report, the stated purpose of the bill was to create "a new felony carrying a sentence equal to second degree murder for which the prosecution would not have to prove the defendant had an intent to kill."[3] (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 27X (1993-1994 Reg. Sess.) as amended Aug. 8, 1994.) Based on this, he argues the legislative purpose was to circumvent the requirements for murder.

Legislative motive, however, is *not* the determining factor for court scrutiny under a due process attack. As was stated in *Montana v. Egelhoff, supra,* 518 U.S. at page 49, footnote 3 [116 S.Ct. at page 2020], "Whatever [the state's lawyers] guess will of course not necessarily be the *real reason* the [legislature] adopted the provision; [the state's] lawyers must speculate about that, just as we must. Our standard formulation has been 'Where . . . there are plausible reasons for [the legislature's] action, our inquiry is at an end.' [Citation.]" (Original italics.) And we are mindful that the burden lies not with the state to show that there are legitimate reasons for the legislative choice. Rather, the burden lies with Malfavon to show that there are none.

Malfavon relies on the interplay of two recent cases as support for his position. In *People v. Preller, supra,* 54 Cal.App.4th 93 [62 Cal.Rptr.2d 507],

---

[3]A few years later, the penalty was increased to 25 years to life from the previous term of 15 years to life, the punishment for second degree murder.

section 273ab was characterized as a murder statute in dicta. However, the issue in the case was the language in the jury instruction defining the elements of the offense, not any aspect of a due process attack on the statute. ▉ We accord great weight to the rule that " 'an opinion is not authority for a proposition not therein considered.' [Citation.]" (*People v. Albritton, supra,* 67 Cal.App.4th at p. 655.)

▉ In a subsequent case, *People v. Albritton, supra,* 67 Cal.App.4th 647, the court rejected a due process attack on section 273ab as vague and overbroad. Although the ultimate holding of the *Preller* opinion was affirmed, *Preller*'s dictum characterizing section 273ab as a murder statute was firmly rejected. Initially, the *Albritton* court noted that " 'the starting point of our [due process] analysis is "the strong presumption that legislative enactments 'must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] . . .' " ' [Citations.]" (*Albritton, supra,* at p. 657.) Examining the statute's language, the *Albritton* court concluded it gave adequate notice of the proscribed conduct.

The next issue addressed in *Albritton,* however, is particularly helpful to us. Albritton contended section 273ab constituted a "strict liability" offense, imposing a murder sentence for an offense "without a mental state element." The reviewing court concluded he was "mistaken." (*People v. Albritton, supra,* 67 Cal.App.4th at p. 658.) Although a strict liability offense is one "which dispense[s] with *any* mens rea, scienter, or wrongful intent" (*People v. Simon* (1995) 9 Cal.4th 493, 519 [37 Cal.Rptr.2d 278, 886 P.2d 1271], italics added), such a statute is not constitutionally barred in all cases, although disfavored. (*Id.* at pp. 519-520.) However, in concluding section 273ab was *not* a strict liability crime, the *Albritton* court held the intent element was not lacking. Rather, it held that the statute was "a general intent crime . . . [¶] . . . analogous to section 245, subdivision (a)(1), which makes it a felony for any person 'by any means of force likely to produce great bodily injury' to commit an assault upon another." (*People v. Albritton, supra,* 67 Cal.App.4th at p. 658.)

Albritton complained that "he [was] 'in effect . . . found guilty of murder . . . based upon the sentence' required by section 273ab even though the jury found he did not have the mens rea for murder . . . . This complaint essentially repeats Albritton's [and Malfavon's] argument that section 273ab is a murder statute, which is an argument that defies traditional legal concepts requiring malice aforethought as an element of murder. [¶] We already have indicated . . . that it is a misnomer to call section 273ab a murder statute and it is more akin to a child abuse *homicide* statute. Albritton [and Malfavon] ha[ve] not identified any viable constitutional reason why

the state cannot criminalize such conduct and make it a separate crime when the victims are young children. Considering the purpose of the statute—to protect children at a young age who are particularly vulnerable—there can be no dispute of the gravity of the governmental interest involved. As our Supreme Court put it, it is 'an interest of unparalleled significance: the protection of the very lives of California's children, upon whose "healthy, well-rounded growth . . . into full maturity as citizens" our "democratic society rests, for its continuance . . . ." ' [Citation.]" (*People v. Albritton, supra,* 67 Cal.App.4th at pp. 659-660, italics added.)

Distilled to its essence, Malfavon's reason for having us strike down the statute is that it penalized him for the unlawful killing of seven-month-old Kendra, despite the evidence that indicated he attacked her with only the general criminal intent of aggravated assault. But he has failed to show that this is not a compelling reason for the Legislature to criminalize such conduct. The general presumption supporting legislative action prevails in this case.

### III

### *Multiple Conviction Violation*

Malfavon contends that section 273ab is "wholly contained" within the elements of murder, and thus, he cannot be convicted of both second degree murder *and* the section 273ab charge. (Cf. *People v. Ortega* (1998) 19 Cal.4th 686, 692 [80 Cal.Rptr.2d 489, 968 P.2d 48] [" 'multiple convictions may *not* be based on necessarily included offenses. . . .' "].) Because the section 273ab charge carries a *greater* sentence than the second degree murder count even though it is the lesser included offense, he demands we strike the child abuse homicide count and its 25-year-to-life term, and order execution of the 15-year-to-life sentence for the murder. The Attorney General responds that section 273ab is the "greater" of the two offenses simply because of the increased penalty and, therefore, Malfavon's 25-year-to-life term for that count was proper.

Multiple punishment and multiple conviction are two separate "critters." Although both concepts are reflected in section 654,[4] the statute principally addresses multiple punishment. The double jeopardy protection is the principal basis behind the multiple conviction prohibition and is statutorily

---

[4]Section 654, subdivision (a), provides that "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

reflected in sections 954 and 1023.[5] To further muddy the waters, both concepts may overlap—or be overlapped by—the multiple prosecution bar. (See generally 3 Witkin & Epstein, Cal. Criminal Law, *supra*, Punishment, §§ 135-139, pp. 199-203.)

In *People v. Ortega, supra,* 19 Cal.4th at page 692, the tension between these distinct concepts was recognized. " 'This court has long struggled with the problem of permitting multiple convictions while protecting the defendant from multiple punishment.' The solution we have adopted is, in general, to *permit* multiple convictions on counts that arise from a single act or course of conduct—but to avoid multiple punishment, by staying execution of sentence on all but one of those convictions." (*Ibid.,* italics added.) Following this delineation, Malfavon has no grounds to object because the execution of the sentence as to the murder charge was stayed pursuant to section 654.

"Tension" between these concepts understates the complexity of the issue. As *Ortega* noted, "despite the seemingly absolute language of section 954 . . . , there is an exception to the general rule permitting multiple convictions. 'Although the reason for the rule is unclear, this court has long held that multiple convictions may *not* be based on necessarily included offenses. [Citations.]' [Citation.] ■■ ' "The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense." [Citations.]' [Citation.]" (*People v. Ortega, supra,* 19 Cal.4th at p. 692.)[6]

In comparing the two offenses, we must look to either the actual language of the statutes (e.g., *People v. Ortega, supra,* 19 Cal.4th at p. 693) or " ' "the facts actually alleged in the accusatory pleading." ' " (*People v. Sanchez* (2001) 24 Cal.4th 983, 988 [103 Cal.Rptr.2d 698, 16 P.3d 118].) The offenses are necessarily included if, under either method of comparison, all the elements of one offense are included within those of the other " ' "such that the greater cannot be committed without also committing the lesser." ' " (*Ibid.*)

■■ In *People v. Sanchez, supra,* 24 Cal.4th 983, the court noted that assault with a deadly weapon was *not* a necessarily included offense within

---

[5]Section 954 states that "An accusatory pleading may charge . . . different statements of the same offense" and "the defendant may be convicted of any number of the offenses charged . . . ."

[6]In *Ortega,* the court compared carjacking and grand theft and concluded the theft charge was not necessarily included within the carjacking. (*People v. Ortega, supra,* 19 Cal.4th at p. 693.) On the other hand, it held that grand theft *was* necessarily included within the charge of robbery. (*Id.* at p. 694.)

murder because "in the abstract a murder can be committed without a deadly weapon." (*Id.* at p. 988.) In its holding, it ruled gross vehicular manslaughter while intoxicated was not a necessarily included offense of murder even though "as a factual matter, a murder may be carried out by means of a vehicle and by an intoxicated driver[; but] in the abstract it obviously is possible to commit a murder without committing gross vehicular manslaughter while intoxicated." (*Ibid.*)

We compare murder and child abuse homicide, and reach the same conclusion as did the Supreme Court in its comparison of assault with a deadly weapon and murder (*People v. Sanchez, supra,* 24 Cal.4th at p. 988), carjacking and theft (*People v. Ortega, supra,* 19 Cal.4th at p. 693), and burglary and receiving stolen property (*People v. Allen* (1999) 21 Cal.4th 846, 866 [89 Cal.Rptr.2d 279, 984 P.2d 486]). Murder requires proof of an unlawful killing with malice aforethought. The child abuse homicide charge requires proof of the following elements, none of which are required for murder: (1) the age of the victim must be under eight, (2) the assailant must occupy the position of caretaker of the child, and (3) the assailant must commit an assault with force such that a reasonable person would know it was likely to inflict great bodily injury. (For the elements of the offenses, see Discussion, pt. I.B., *ante*; CALJIC Nos. 8.10, 9.36.5.) Thus, neither murder nor child abuse homicide is a necessarily included offense within the other: Both include elements not required by the other crime.

Malfavon argues that an assault on a child resulting in death is equivalent to the unlawful killing element in a murder charge. He contends it merely lacks the proof of malice aforethought to constitute murder. Thus, his conviction for the child abuse homicide charge must be dismissed as the jury found him guilty of both counts. He demands we compare the language in the charging document, which is the actual and specific accusation he faced, to see if the child abuse homicide was subsumed within the language of the charge under second degree murder.

The information accused him of "willfully, unlawfully and with malice aforethought murder[ing] Kendra A. Gonzalez" and of "willfully and unlawfully assault[ing] Kendra A. Gonzalez, a child under eight years of age, by force likely to produce great bodily injury and . . . caus[ing] her death." Malice aforethought is either "a deliberate intention unlawfully to take away the life of [another]" or "when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) Malfavon argues that the murder cannot occur without necessarily committing the child abuse homicide as the elements of the child abuse homicide constitute the unlawful killing aspect of murder.

A similar argument was made to us in *Orlina v. Superior Court, supra,* 73 Cal.App.4th 258. We compared the elements of section 273ab with those for involuntary manslaughter, which is legally defined as " 'the unlawful killing of a human being *without* malice' where it occurs 'in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. . . .' " (*Orlina,* at p. 261, italics added; see § 192, subd. (b).) We noted that an unlawful killing *might* be equivalent to section 273ab's assault, but not necessarily. However, section 273ab "is predicated on a *probability of great bodily injury* to the victim [citation], while . . . involuntary manslaughter is based on the *possibility of the death* of the victim. Section 273ab speaks to *reckless* conduct . . . while . . . involuntary manslaughter encompasses *careless or negligent* conduct . . . ." (*Orlina, supra,* 73 Cal.App.4th at p. 261, original italics.)

The same observations are pertinent to the comparison between section 273ab and the murder statute. Section 273ab is geared to a situation in which there is a *probability* of great bodily injury; murder focuses on the probability of death. Section 273ab speaks to reckless conduct; murder targets "a deliberate intention unlawfully to [kill another] or . . . an abandoned and malignant heart." (§ 188.) These are not mere distinctions without a difference. As section 273ab is not necessarily included within the murder charge, the judgment is affirmed.

Rylaarsdam, J., and Bedsworth, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 18, 2002.