Filed 12/20/13  P. v. Morales CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046967 |
| v. | (Super. Ct. No. 08CF1695) |
| GABRIELA MARIANA MORALES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed in part and reversed in part, with a limited remand.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Gabriela Mariana Morales of second degree murder (count 1; Pen. Code, § 187, subd. (a); all further statutory references are to this code), assault on a child under eight years old with force likely to produce great bodily injury resulting in death (count 2; § 273ab), and willful child abuse (count 3; § 273a) for killing her four-year-old son Brandon Morales, either as the direct perpetrator or as an aider and abettor or in conspiracy with her boyfriend, Alberto Guzman. The jury also found true as to count 3 an enhancement that Morales caused or permitted a child to suffer unjustifiable pain and injury that resulted in death. (§ 12022.95.) Morales raises a host of claims attacking the jury instructions. We agree the instructions were inadequate to convict Morales of murder based on a conspiracy theory and, because it is impossible to determine whether the jury found Morales guilty of murder on that theory or as a direct perpetrator or aider and abettor, we reverse the murder conviction. As we explain, her other contentions are without merit and we therefore affirm the remainder of the judgment, remanding for the limited purpose of a possible retrial on the murder count, at the prosecutor's election.

I

FACTUAL AND PROCEDURAL BACKGROUND

On May 30, 2008, paramedics and firefighters responded to an emergency call that a child had fallen from a bunk bed in a Santa Ana apartment complex. Finding four-year-old Brandon cold, pale, and without a pulse, cardiac activity or discernible breathing, they noticed bruising of various sizes, color, and age covering Brandon's head, face, and body. The fire captain believed Brandon's injuries were inconsistent with a fall from a bunk bed and called for a police evaluation. He considered the apartment to be a crime scene.

Paramedics transported Brandon to a hospital where the emergency room physician unsuccessfully attempted to revive him, concluding he had been dead for at least an hour before his arrival. The doctor found Brandon's bruising too extensive to have been inflicted during medical intervention. A forensic pathologist observed Brandon was slightly undernourished when he died, and concluded severe blunt force head trauma caused Brandon's death. Specifically, his head injuries caused fatal swelling in his brain, cutting off blood flow to vital areas responsible for heartbeat and respiration. Brandon's dead body revealed over 30 bruises from head to toe. Twelve separate injuries to his head and face marked unique head and brain injury impact sites. The pathologist tested seven of those sites, finding all but one occurred within 24 hours before his death. He also had hemorrhages on his brain dating back at least a few weeks, and new injuries lay over older ones.

Morales changed her story of what happened to Brandon several times as she spoke with an officer at the hospital, and her story continued to change in two further interviews with detectives. Eventually, Morales admitted she and Guzman frequently hit Brandon in the seven months since he arrived to live with them after staying with her mother in Mexico most of his early life. Morales described Brandon as having behavioral and communication problems, and she believed they never bonded because he had been raised by his grandmother.

At first, she claimed she had stopped hitting Brandon lately, and instead resorted to punishing the four year old with writing exercises. Then she said that the morning of Brandon's death she heard Guzman hitting Brandon as he bathed him. Guzman was upset at Brandon for eating from the trash. Investigators, however, found feces in the bathtub, and wet pajamas containing feces in the trash can. A large trash bag

3

in the kitchen contained a towel, tissue, and a woman's blouse coated in blood. DNA testing showed the blood was Brandon's.

According to Morales, Guzman had hit Brandon on the mouth, causing him to bleed, and Guzman became more upset when Brandon bloodied the towel. Morales warned Guzman to leave Brandon alone, and cleaned up Brandon's bleeding lip.

After his bath, Morales made Brandon do writing exercises and when he failed to do them correctly, she struck him once on the head, causing him to hit his head on his chair and fall. She picked him up and placed him in the chair, and he continued writing. After she went to the sofa to sit down, she heard him fall again about five minutes later. Checking on him, she noticed he looked disoriented. She took him to the bathroom, placed him in a cold bath, and later put rubbing alcohol on his chest to revive him. But she needed to pick up her other children from school, so she dressed him and carried him with her. Realizing when she returned that he was not doing any better, she went to her neighbor's house for help.

Morales initially told investigators Guzman left the apartment at 10:30 a.m. that day, but video surveillance in her complex showed him leaving around 1:00 p.m. She also told the investigators Brandon seemed "a little weak" when it was time to get her other children from school, but she did not think it was serious. The video footage, however, showed her leaving her apartment with a limp child in her arms before returning with her other children 35 minutes later.

Morales and Guzman described in their interviews several instances in which they struck Brandon to discipline him. Morales recounted a similar incident two weeks earlier, in which she heard Guzman beating Brandon in the bathroom. Brandon fainted and Guzman carried him to the bed, where Morales revived him with ice and

4

rubbing alcohol, concluding he was well enough for her to leave for work. According to Morales, Guzman also struck Brandon around this time for urinating on the bed. On another occasion, Guzman hit Brandon with a toilet plunger so hard he broke the plunger. According to Morales, she disciplined Brandon by hitting him with an open hand, and by making him take cold baths, while Guzman often disciplined Brandon by hitting him with his fist and belt. Morales claimed Guzman never threatened her, but she felt as though he was compelling her to withdraw from her friends and family.

Morales and Guzman were tried in separate trials. After the jury returned its verdict against Morales in May 2012, the trial court imposed a mandatory term of 25 years to life for count two, assault on a child resulting in death (child homicide), and stayed under section 654 a term of 15 years to life for count 1. The court dismissed the child abuse conviction in count 3 as a lesser included offense, and Morales now appeals.

II

DISCUSSION

A.    *The Trial Court Did Not Err in Failing to Give a Unanimity Instruction*

Morales argues the trial court erred by instructing the jury it need not agree unanimously on a particular murder theory, only that Morales committed murder. The court instructed the jury: "The defendant has been prosecuted for murder under three theories: 1) as a perpetrator with malice aforethought[,] 2) as an aider and abettor and 3) as a co-conspirator. [¶] Each theory of murder has different requirements, and I have instructed you on all three. [¶] You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. You do not all need to agree on the same theory." (CALCRIM No. 548.) Morales claims the trial court compounded its error because, "[i]n

5

addition to not requiring agreement on the theory of liability, the jury was not given any instruction requiring unanimous agreement on any single event or act leading to Brandon's death." The trial court did not err.

California law requires a unanimous verdict for criminal convictions. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*); Cal. Const., art. I, § 16.) All 12 jurors must agree the defendant has committed a felonious offense, but a unanimity instruction is not always required. Where appropriate, the instruction "'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*Russo*, at p. 1132.) Put another way, the instruction aims "'to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.'" (*Ibid*., original italics.)

But as the Supreme Court has explained, "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Russo*, *supra*, 25 Cal.4th at p. 1132.) The Supreme Court explained by example in *Russo* that, "to convict a defendant of first degree murder, the jury must unanimously agree on guilt of a specific murder but need not agree on a theory of premeditation or felony murder." (*Id.* at p. 1133.)

Similarly, the jury here was not required to settle unanimously upon one of the three theories under which Morales committed murder, whether as a direct perpetrator, aider and abettor, or coconspirator. "'There may be a reasonable doubt that

the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other.'" (*Russo*, *supra*, 25 Cal.4th at p. 1136.) In such instances, "'there is no unanimity requirement as to the theory of guilt, [and] the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt.'" (*Ibid.*)

Consequently, when a single homicide is charged, "unanimity as to exactly how the crime was committed is not required." (*Russo*, *supra*, 25 Cal.4th at p. 1135.) A murder constitutes a single criminal event, and a defendant is not entitled to a unanimous verdict as to the particular manner or the precise moment during which the murder occurred. (*People v. Pride* (1992) 3 Cal.4th 195, 249-250.) In other words, because the evidence did not "suggest[] two discrete crimes, i.e., two discrete conspiracies" or, here, two discrete murders, but rather "merely . . . the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime" (*Russo*, at p. 1135), a unanimity instruction was not appropriate.

This is particularly true when, as here, "'the acts alleged are so closely connected in time as to form part of one transaction.' [Citations.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) "[W]here . . . the evidence establishes a pattern of physical trauma inflicted upon a child within a relatively short period of time, *a single course of conduct is involved*," and no unanimity instruction is required. (*People v. Napoles* (2002) 104 Cal.App.4th 108, 116, original italics.) No instruction is required because the nature of the evidence calls for the jury to decide whether all the acts or none occurred, not any particular act. In other words, where there is no evidence from which the jury could have found the defendant guilty of one abusive act, but not others — such as where different defenses are asserted as to each — there is no danger that different jurors would find the

7

defendant guilty of different offenses. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.) Morales's unanimity claims therefore fail.

B.      *The Trial Court Did Not Err in Instructing the Jury on a Conspirator's Liability*

Morales contends the trial court erred by instructing the jury a conspirator may be liable for the completed offense or offenses that formed the object of an uncharged conspiracy (CALCRIM Nos. 416 & 417). Morales insists coconspirators may only be convicted of the independent criminal offense of conspiring to commit a crime (§ 182), not the underlying offenses themselves. Here, the prosecutor did not charge Morales with a conspiracy to commit child abuse or murder or any other offense, but based on the trial court's instructions, the prosecutor argued the jury could find Morales guilty of the substantive offenses of murder (count 1) or child homicide (count 2) if she perpetrated those offenses herself, aided and abetted Guzman in committing them, or conspired with Guzman to commit child abuse amounting to murder or an assault likely to cause great bodily injury to Brandon.

According to Morales, the trial court erred in identifying conspiracy as a basis of liability because "the Legislature has, by statute, limited criminal liability to those who actually perpetrate a crime and those who aid and abet the actual perpetrators of a crime, but not to those who conspire to commit a crime." Specifically, Morales claims that because section 31 includes as "principals" in a crime those who "directly commit the act constituting the offense" and those who "aid and abet in its commission" — without also expressly identifying conspiracy as a basis for liability as a principal — the Legislature did not intend to punish conspirators for successfully completed offenses, but only for the substantive crime of conspiracy, as defined in section 182.

8

As Morales recognizes, however, the Supreme Court rejected this contention in *People v. Valdez* (2012) 55 Cal.4th 82, 149-150 (*Valdez*), and she merely preserves it for potential future review. We will not delve into the issue. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) As the Supreme Court explained in *Valdez*, ample precedent has "'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." [Citation.]' [Citations.]" (*Valdez*, at p. 150.) Such instructions "'correctly state[] the law concerning conspiracy as an alternative theory of liability. [Citations.] Accordingly, there was no error.'" (*Ibid.*)

C.    *The Instructions Were Inadequate to Convict Morales of Murder on a Conspiracy Theory*

Morales argues the trial court erroneously instructed the jury it could convict her of murder (count 1) or child homicide (count 2) based on a conspiracy theory even if she and Guzman only agreed to commit involuntary manslaughter and she or Guzman only committed involuntary manslaughter. Morales also argues the court's conspiracy instruction diluted the prosecutor's burden of proof and thereby violated due process because it "allowed [her] to be convicted of murder and child abuse causing death, even if neither of those crimes was actually committed by either [her] or by Guzman." "In other words, the jury was instructed [Morales] could be convicted of the greater offenses if she conspired to commit a lesser offense and a coconspirator actually committed the lesser offense . . ." of involuntary manslaughter. As we explain, Morales

9

misreads the conspiracy instructions (CALCRIM Nos. 416 & 417) in two keys ways, but we nevertheless agree the instructions' contemplation of *involuntary manslaughter* as a natural and probable consequence of the conspiracy did not furnish a basis for convicting Morales of *murder*.

Contrary to Morales's claim, the instructions did *not* state she could be convicted of murder (count 1) and child homicide (count 2) if she conspired to commit the lesser offense of *involuntary manslaughter*. To the contrary, CALCRIM No. 417 clearly stated that "[t]o prove that the defendant is guilty of the crimes charged in Counts 1 and 2 under a conspiracy theory, the People must prove that: [¶] 1. The defendant conspired to commit the crime of *child abuse likely to cause great bodily harm* . . ." (italics added) and not, as Morales erroneously asserts, the lesser crime of involuntary manslaughter.

Morales is also mistaken in suggesting the jury may have found under the instructions merely that "Guzman committed involuntary manslaughter," and therefore she could not be convicted of either of the "greater offenses" of murder or child abuse resulting in death. She is mistaken because *Guzman* could not commit involuntary manslaughter given the crime consists of criminal negligence in failing to meet a legal duty to protect a child, and Guzman had no parental or other relationship with Brandon giving rise to such a duty. (§ 192, subd. (b); CALCRIM No. 582.) The trial court gave CALCRIM No. 582 properly instructing the jury on the necessity of a legal duty to protect Brandon for involuntary manslaughter to apply. No evidence suggested Guzman had a parental relationship or other source of duty to Brandon, and therefore we will not suppose the jury considered the conspiracy instructions with Morales's erroneous premise

10

that Guzman may have committed involuntary manslaughter. Only Morales could commit that offense.[1]

Nevertheless, Morales's central point remains her attack on the notion "that the crime of involuntary manslaughter," even if she rather than Guzman committed it, "can lead to the conviction of greater offenses based on an uncharged conspiracy theory." Morales acknowledges "California's natural and probable consequences doctrine" provides one may be liable not only for the target offense one intends to commit, "'but also for any other offense (nontarget crime) *committed by* the confederate as a natural and probable consequence . . . .'" (Quoting *People v. Prettyman* (1996) 14 Cal.4th 248, 254, italics added.) Accordingly, if a member of the conspiracy commits "only" involuntary manslaughter, *and no confederate in the conspiracy commits murder or child abuse causing death*, Morales is correct the conspirators cannot be liable for these greater offenses as a natural and probable consequence of their intended crime. Simply put, if no greater offense is committed, a defendant cannot be liable for it as the natural and probable consequence of a lesser intended offense.

The question here is whether under the instructions given, the prosecutor necessarily proved one or more of the greater offenses was committed. According to the Attorney General, "even if the jurors relied on the conspiracy theory with involuntary manslaughter as the non-target offense, the instructions still required the jurors to find

---

[1]     Morales does not acknowledge or base any claim of error in this distinction. She and Guzman were tried separately, and we presume an instruction based on the conspiracy theory was not given in his trial. (Cf. 12 Cal.Jur.3d (2008) Civil Conspiracy, § 5, p. 226 ["the doctrine of conspiracy does not impose liability on persons who owe no duty to the plaintiff"]; *Klistoff v. Superior Court* (2007) 157 Cal.App.4th 469, 479-480 [private business and its president not legally capable of violating statute prohibiting public officials from having an interest in public contracts, and therefore could not be liable for conspiracy to violate statute].) Neither party here suggests the distinction makes any difference as to Morales.

11

beyond a reasonable doubt the required elements for second degree murder [count 1] and child homicide [count 2]." The Attorney General is correct on the latter count, but not the murder count.

The trial court instructed the jury in pertinent part: "To prove that the defendant is guilty of the crimes charged in Counts 1 and 2 under a conspiracy theory, the People must prove that: [¶] 1.The defendant conspired to commit the crime of child abuse likely to cause great bodily harm; [¶] 2. A member of the conspiracy committed murder, *involuntary manslaughter*, **or** assault on a child with force likely to produce great bodily injury resulting in death to further the conspiracy; [¶] AND [¶] 3. Murder, *involuntary manslaughter*, **or** assault on a child with force likely to produce great bodily injury resulting in death were natural and probable consequences of the common plan or design of the crime that the defendant conspired to commit," i.e., child abuse likely to cause great bodily harm (count 2).[2] (CALCRIM No. 417, bold and italics added.)

Put another way, the conspiracy theory contemplated (1) a conspiracy to commit child abuse likely to cause great bodily injury, (2) that a conspirator committed at

---

[2]    The trial court's instructions defined the elements of involuntary manslaughter as follows: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant had a legal duty to protect Brandon Morales from harm; [¶] 2. The defendant failed to perform that legal duty; [¶] 3. The defendant's failure was criminally negligent; [¶] AND [¶] 4. The defendant's failure caused the death of Brandon Morales." (CALCRIM No. 582.)

The instruction also explained that "[a] parent has a legal duty to make reasonable efforts to protect her child from being attacked. A parent does not have to risk her own life or risk great bodily injury to herself to protect a child." (CALCRIM No. 582.) It additionally explained, "Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: [¶] 1. She acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk." (*Ibid.*)

12

least involuntary manslaughter if not also murder or child abuse resulting in death, and (3) that involuntary manslaughter was a foreseeable consequence of the agreement to commit child abuse likely causing great bodily injury. According to these conspiracy instructions, proving the foregoing three elements sufficed to "prove that the defendant is guilty of the crimes charged in Counts 1 and 2 . . . ."

As to count 2, "[t]he elements of assault on a child, resulting in death, are: (1) A person, having the care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death." (*People v. Malfavon* (2002) 102 Cal.App.4th 727, 735 (*Malfavon*); § 273ab.) The first and last elements are indisputably satisfied given Brandon was four years old, in his mother's care, and the injuries he received resulted in his death; no reasonable juror could fail to reach this conclusion, and it is therefore of no consequence the jury was not asked in the conspiracy or involuntary murder instructions to determine these two elements. (*People v. Bell* (2009) 179 Cal.App.4th 428, 439 [harmless error in omission of an element necessarily resolved adversely to the defendant].)

As the Attorney General explains, the jury by its guilty verdict necessarily determined under the conspiracy and involuntary murder instructions the remainder of the elements constituting count 2 against Morales. This is true even assuming the jury reached its verdict on count 2 relying on the conspiracy theory, and therefore may have relied solely on the conspiracy and involuntary manslaughter instructions instead of turning to the child abuse instructions for count 2 pertinent to a direct perpetrator or aider and abettor.

13

Specifically, the remaining elements to satisfy count 2 required evidence that: (2) Brandon received his injuries by assault and not some other cause, and (3) the assault or assaults were of such force that a reasonable person would know they would likely cause great bodily injury. (See *ante* at p. 13; *Malfavon*, *supra*, 102 Cal.App.4th at p. 735.) The gravamen of these elements is that the child is assaulted with such force a reasonable person would know of the grave danger of serious injury. These elements are satisfied when a jury finds as here (at a minimum) a conspiracy in which a parent and another person agree to assault a child with force likely to cause great bodily injury and the child is assaulted in this manner due to the parent's failure to protect the child from conduct she allowed or inflicted, knowing it created "a high risk of death *or great bodily injury*." (CALCRIM No. 582 (involuntary manslaughter).) Consequently, even assuming the jury reached its verdict on count 2 only under a conspiracy theory in which Morales committed involuntary manslaughter, and therefore did not turn to the instructions for count 2 on a direct perpetrator or aider and abettor theory, Morales's claim she was convicted of a greater offense than she actually committed is without merit.

But precisely because the conspiracy and involuntary manslaughter instructions allow for a conviction where a defendant conspires only to inflict abuse causing great bodily injury on a child, and may be aware in her negligence only of a "high risk of . . . great bodily injury" (CALCRIM No. 582) *instead of the "danger[] to human life" necessary for implied malice murder* (CALCRIM No. 520, italics added), we must reverse the murder conviction. Specifically, as reflected above in the conspiracy instruction (*ante*, p. 12) and the involuntary manslaughter instruction (*ante*, p. 12, fn. 2), nothing in these instructions required the jury to conclude Morales knew the natural and

14

probable consequences of her actions in striking or failing to protect Brandon were "dangerous to human life," as required for implied malice murder. (See CALCRIM No. 520.[3])

Put another way, it is impossible to determine whether the jury concluded Morales's agreement to commit abuse likely causing *great bodily injury* (as contemplated in the conspiracy theory instruction) — or an awareness that her negligence could cause *great bodily injury* (a prerequisite for involuntary manslaughter) — presented the necessary danger to human life to constitute implied malice murder, given they were instructed that great bodily injury may be merely "greater than minor or moderate harm." (CALCRIM No. 582 ["Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm"].)

Consequently, we must reverse the murder conviction because we cannot tell whether the jury necessarily determined Morales harbored the requisite mens rea for murder, which includes knowledge of the danger to human life. We cannot deem the error harmless, as the Attorney General suggests, because the instructions expressly provided for *alternate* theories on which to convict Morales of murder — as a perpetrator, an aider and abettor, *or on the conspiracy theory*. Given that each alternate theory purported to furnish an independent basis on which to convict Morales of murder, we cannot eliminate the possibility the jurors relied solely on the conspiracy theory, in

---

3     As the trial court instructed the jury, the requisite malice for Morales to commit murder could consist of implied malice if: "1. She intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time she acted, *she knew her act was dangerous to human life*; [¶] AND [¶] 4. She deliberately acted with *conscious disregard for human life*." (CALCRIM No. 520, italics added.)

15

which case they never adjudicated whether she harbored the necessary mens rea for implied malice murder.

D. *The Trial Court Properly Instructed the Jury on General and Specific Intent*

In a related but unavailing argument, Morales complains the trial court's general instruction on specific and general intent (CALCRIM No. 252) failed to explain or direct the jury to the particular mens rea requirements applicable to each general intent crime she faced. "[E]ven a general intent crime ordinarily requires scienter, i.e., guilty knowledge of the facts which make the act a crime." (*People v. Laster* (1997) 52 Cal.App.4th 1450, 1468.) Only strict liability offenses dispense with a mens rea requirement, and they are both rare and "disfavored" but include, for example, public health penal statutes regulating the handling of hazardous wastes and poisons. (*People v. Simon* (1995) 9 Cal.4th 493, 519-521.) Morales insists the trial court's use of CALCRIM No. 252 was erroneous because it eliminated the mens rea requirement, substituting only the general intent necessary to commit a general intent crime.

Specifically, the trial court instructed the jury in CALCRIM No. 252: "The following crimes and allegation require general criminal intent: involuntary manslaughter, which is a lesser crime to murder as charged in count 1, assault on a child with force likely to produce great bodily injury resulting in death as charged in count 2 and the lesser crimes of assault with force likely to produce great bodily injury and simple assault, the crime of felony child abuse as charged in count three and the lesser crime of misdemeanor child abuse and the enhancement to count 3 under Penal Code Section 12022.95. For you to find a person guilty of these crimes or to find the enhancement true, that person must not only commit the prohibited act, or fail to do the required act, but must do so with wrongful intent. A person acts with wrongful intent

16

when she intentionally does a prohibited act, or fails to do a required act; however, it is not required that she intend to break the law. *The act required is explained in the instruction for each crime and enhancement*." (Italics added.)

The instruction additionally stated: "The crime of murder requires a specific intent or mental state. For you to find a person guilty of this crime, that person must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime."

Morales suggests that a similar, explicit reference to the relevant mental state in other instructions should have been given for the general intent crimes, and not just murder. The instruction, however, is a correct statement of law properly given when general and specific intent crimes are charged together (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1189-1190), and if Morales desired clarifying or amplifying language, her failure to request it below forfeits the challenge. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.)

Additionally, the court admonished the jury to consider the instructions as a whole (CALCRIM No. 200 ["consider them together"]), and we presume jurors are intelligent persons capable of correlating and following the instructions. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) Indeed, CALCRIM No. 252 referred the jurors to the pertinent instructions for each general intent crime for the requisite "act required" and each instruction specified the requisite mens rea accompanying the act. For example, CALCRIM No. 820 specified that to be convicted of an assault causing the death of a child the defendant must act with an "aware[ness] of facts that would lead a reasonable person to realize that her act by its nature would directly and probably result

17

in great bodily injury to the child." While the jury may not have turned to this instruction if it relied solely on a conspiracy theory, as discussed, the involuntary manslaughter instruction (CALCRIM No. 582) pertinent to the conspiracy theory included the requisite mens rea consisting of an awareness that one's reckless and criminal negligence "creates a high risk of death or great bodily injury." Morales argues CALCRIM No. 252 dispensed with this knowledge requirement by simply defining general intent as the intentional commission of an act. But reading the instructions together, as directed, the jury would understand the offense required *both* an intentional act inflicting injury *and* an awareness of the direct and probable danger of at least great bodily injury, if not death.

Morales's challenge is therefore without merit, as is her related claim of cumulative instructional error. Because the only instructional error concerns the murder charge on a conspiracy theory, there is no error to cumulate, and we affirm the remainder of the judgment.

III

DISPOSITION

Morales's murder conviction is reversed and the remainder of the judgment is affirmed. The matter is remanded for the limited purpose of a possible retrial on the murder count. If the prosecution elects not to retry the murder count or at the conclusion of the retrial, the court shall resentence Morales.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.

19