Filed 11/28/23  P. v. Morris CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JAMES MORRIS,<br><br>　　　　Defendant and Appellant. | C097497<br><br>(Super. Ct. No. 05F11542) |

SUMMARY OF THE APPEAL

In 2008, a jury found the defendant James Morris guilty of the second-degree murder and the Penal Code section 273ab assault (child abuse homicide)[1] of three-year-

---

[1] The term "child abuse homicide" is used in *People v. Malfavon* (2002) 102 Cal.App.4th 727, 731 (*Malfavon*), and we use it here for consistency's sake. However, given our Supreme Court's decision in *People v. Wyatt* (2010) 48 Cal.4th 776, 779, 781 (*Wyatt*), in which the Court identified the requisite mens rea for this crime as the

1

old KC.  Statutory section citations that follow are found in the Penal Code unless otherwise stated.

During that trial, the court instructed the jury that it could find the defendant guilty of both crimes under the natural and probable consequences doctrine applicable to persons who aid and abet others in the commission of crimes.  The trial court sentenced defendant to 25 years to life on the child abuse homicide conviction.  It sentenced defendant to 15 years to life on the second-degree murder conviction but stayed that sentence under section 654.

In 2019, defendant filed a section 1172.6 (then section 1170.95) petition to have his second-degree murder conviction vacated and to be resentenced under a post-conviction amendment to the statutes governing murder that eliminated the natural and probable consequences doctrine as it relates to murder.  (*People v. Lopez* (2020) 51 Cal.App.5th 589, 597; see also § 188, subd. (a)(3).)  The court granted the defendant's petition.  It vacated the second-degree murder conviction, redesignated the conviction to a conviction for child endangerment under section 273a, subdivision (a), and imposed, then stayed, a sentence of four years for the redesignated offense.

At the resentencing hearing the defendant asked the court to also redesignate his child abuse homicide conviction.  The court denied the request, finding there was no statutory authority to do so.

On appeal, the defendant argues that in denying his request to redesignate the child abuse homicide conviction the trial court misapplied section 1172.6.  The defendant reasons that (1) section 1172.6 allows persons who were previously convicted of

---

one associated with assault, the term "child assault death" would be an equally if not more apt shorthand.  This is so, particularly since Penal Code section 273ab, subdivision (b) punishes the same conduct but specifies a different punishment if the result of the conduct is the victim is rendered comatose or permanently paralyzed, which we could aptly be referred to with the shorthand "child assault incapacitation."

manslaughter when they had been prosecuted for murder under the natural and probable consequences doctrine to seek relief; and (2) child abuse homicide is a form of manslaughter. The defendant also argues that, if he is not entitled to have his child abuse homicide conviction vacated by way of a section 1172.6 petition, his rights to equal protection, due process, and the right to be spared cruel and/or unusual punishment under the California and United States Constitutions have been violated. None of these arguments has merit. Because these arguments lack merit, defendant's counsel in the trial court was not ineffective for failing to raise them there.

The defendant raises two more issues about the details of his revised sentence. First, the defendant argues that main jail booking and classification fees imposed at his original sentencing must be vacated, and that any amounts he previously paid towards these fees must be reimbursed. We will direct the trial court to vacate any order it made reimposing the fees but deny the request for reimbursement. Second, he argues the trial court improperly calculated conduct credits for the period between his initial sentence and his resentencing. We agree with the defendant on this point.

FACTS AND HISTORY OF THE PROCEEDINGS

Preliminary Issue Regarding the Parties' Statements of Facts

Before we summarize the facts that led to the defendant's prosecution and conviction, we offer comments about the parties' briefs.

The defendant adopts the statement of facts contained in the trial court's order granting his section 1172.6 petition for resentencing, and then he quotes the entire statement in his opening brief. The People, in contrast, citing California Rules of Court, rule 8.1115(b)(2), take their statement of facts from the unpublished opinion this court issued after defendant appealed his original conviction. (See *People v. Morris* (Oct. 5, 2009, No. C058388) [nonpub. opn.] (*Morris I*).) In his reply brief, defendant takes issue with the People's reliance on the statement of facts from our earlier opinion, stating,

3

"[t]his Court's 2009 opinion was not evidence before the trial court in 2022." Not surprisingly, the facts taken from *Morris I* present a more graphic and disturbing version of the defendant's role in the victim's final days than the facts stated in the trial court's order granting the defendant's section 1172.6 petition.

Defendant's position is, in part, correct. " '[T]he factual summary in an appellate opinion is not evidence that may be considered at an evidentiary hearing to determine a petitioner's eligibility for resentencing.' ([*People v. *]*Flores*[ (2022)] 76 Cal.App.5th [974,] [987-]988; see § 1172.6, subd. (d)(3) [limiting reliance on prior appellate opinions to 'the procedural history of the case'].)" (*People v. Lee* (2023) 95 Cal.App.5th 1164, 1183.)

Because many of the questions at issue in this appeal can be resolved by interpreting the law and/or deciding if that interpretation of the law violates constitutional principles on its face, in much of this decision the facts are not central to our analysis. Thus, in this background section, we present a summary of the statement of facts quoted by the defendant. We take the age of the child and his mother's name from the introductory sentence to the trial court's order.

However, the actual factual record is of import in our assessment of one argument. The defendant claims the sentence for child abuse homicide is cruel and/or unusual punishment not only in the abstract, but also as applied to him. This argument was not raised below. Indeed, on the record before us, the defendant made no argument regarding the impact of his conviction and sentence for child abuse homicide until the resentencing hearing, which was after the trial court wrote the statement of facts the defendant relies on here. As a result, presumably, whether this conviction is cruel and/or unusual was not central to the trial court's analysis when it compiled a statement of facts to provide the context for its order granting resentencing.

4

"Cruel and unusual punishment arguments, under the federal or California tests, require examination of the offense and the offender," and can be "fact specific." (*People v. Norman* (2003) 109 Cal.App.4th 221, 229 (*Norman*).)

While, in theory, we could consider this issue forfeited because it was not raised in the trial court (see *Norman*, *supra*, 109 Cal.App.4th at p. 229), the defendant has argued the failure to raise it denied him his constitutional right to effective assistance of counsel. Efficiency dictates that we resolve this constitutional challenge on the merits. (See *id.* at p. 230.) In the portion of our opinion dealing with the as-applied issue of cruel and/or unusual punishment, we cite evidence reviewed by the trial court from the record of trial when the trial court ruled on the petition.

### Summary of Facts Stated by the Trial Court

The following is a summary of the statement of facts included in the trial court's order granting defendant's petition for resentencing. The child's age and his mother's full name are taken from the introduction to the order.

Three-year old KC lived with his mother Carline Balbuena and the defendant.

On November 17, 2005, KC was taken to the emergency room. KC died on November 18, 2005. A treating physician testified that when KC arrived, he was unresponsive, needed help breathing, and had low blood pressure. Scans revealed critical injuries to both KC's head and abdomen, either of which independently could have caused KC's death. The doctors also observed numerous other bruises on KC's body.

Doctors described KC's injuries as similar to those suffered in a high-speed motor vehicle accident or in falls from two- to three-story heights. One doctor opined a "major intrusional force" caused the abdominal injuries and "a very significant force" to the head caused bleeding on KC's brain. Every doctor that testified agreed KC's injuries were most likely inflicted intentionally, and the doctors were in general agreement that the injuries occurred before November 17, 2005, with lab results indicating they were

5

inflicted 24 to 48 hours before KC arrived at the hospital, and defendant's expert estimating KC was injured two to three days before he died.

Throughout the criminal investigation into KC's death, the defendant said KC's injuries were caused by KC falling out of a crib. The defendant said he placed KC in a crib on the night of November 16, 2005, and awoke the next morning to hear KC choking in the bathroom, where the defendant found KC on the floor with one arm around a toilet. The defendant tried to get KC to stand, but KC collapsed and the defendant told Balbuena, to call 911. The defendant said KC had seemed fine when he checked him at 1 a.m. and he did not know how KC got out of his crib.

In multiple interviews, the defendant denied abusing KC on November 16, 2005. He said when he had arrived home in the afternoon KC was awake, even though Balbuena had told him to take a nap. The defendant made KC jump in place to tire him out, and the defendant said a bruise on KC's eye was sustained when KC fell while jumping. At one point, the defendant admitted to spanking KC on his buttocks with a spatula on November 16, 2005, but he never admitted to any conduct that would explain KC's life ending injuries.

The defendant also said he never saw Balbuena inflict KC's injuries. He told detectives Balbuena had admitted to putting KC's face hard against a wall, but that he did not see it. He said he could not envision Balbuena beating KC up.

On December 7, 2005, Balbuena made a statement to detectives, which the order granting the petition characterizes as "[t]he only account of how KC was injured and by whom" and "nothing short of a confession." Balbuena said she had secretly resumed smoking methamphetamine. She told investigators that after smoking methamphetamine for the whole day on November 16, 2005, she might have hit KC harder than she had originally thought when she made him stand in a corner. She stated she had hit KC's head against a wall when she made him go stand in a corner because he kept looking back at her. She said she did not know her own strength when she smoked

6

methamphetamine and she inflicted a "neck breaking kind of hit." She said she kept hitting KC in the head after he vomited. She estimated she hit him hard and in the back of the head 20 times in 30 minutes. She said when she slammed KC's head into the wall, his head made a huge popping sound. She said KC's black eye could have come from her hitting him, and she said that the defendant was not aware she was hitting KC that morning.

The order notes that Balbuena's statements to detectives were consistent with KC's head injuries, but they did not explain KC's abdominal injuries.

Balbuena said she hid her methamphetamine use from the defendant. She stated she banged KC's head into a wall when he was looking at the defendant. She said the defendant did not know what she had done. She said at one point after KC had been put to bed, she went to check on KC to see if he was asleep while the defendant remained in the other room. She said she found KC still awake, dragged him out of bed, and hit him against the other wall.

Balbuena said she grew increasingly angry because she could not smoke methamphetamine while KC was awake and the defendant, who seemed to be trying to diffuse the situation, was around.

Balbuena concluded the defendant may have heard something when she was checking on KC, but "probably didn't see anything" because she "was going really fast."

At trial, Balbuena recanted the version of events she gave to detectives on December 7, 2005.

Prior Proceedings

In December 2005, the People filed an action charging both the defendant and Balbuena with two counts. Count one accused the defendant and Balbuena of the murder with malice aforethought of KC in violation of section 187, subdivision (a). Count two accused them of violating section 273ab, subdivision (a), by unlawfully, while having the

7

care and custody of KC, a child under the age of eight years, assaulting KC with a means of force that to a reasonable person would seem likely to produce great bodily injury, resulting in the child's death.

The defendant was arrested on December 30, 2005.

The jury trial began in November 2007. The defendant and Balbuena were tried together, but two separate juries, one for each defendant, were selected.

Among other instructions, the jury was instructed with CALCRIM No. 403, which allowed the jury to find the defendant guilty on both charges as a natural and probable consequence in the aiding and abetting of coparticipant in the commission of the crime. The instruction said:

"Another theory you may consider in evaluating whether the defendant is guilty of murder or assault on a child resulting in death and charged in Counts I & II, is the natural and probable consequences doctrine of aiding and abetting.

"Before you may decide whether the defendant is guilty of murder or assault on a child resulting in death under this theory, you must first decide whether he or she is guilty of inflicting physical punishment on a child or felony child abuse.

"To prove that the defendant is guilty of murder, or the lesser offense of involuntary manslaughter, or assault on a child resulting in death under this theory, the People must prove beyond a reasonable doubt that:

"1. The crime of inflicting physical punishment on a child, in violation of Penal Code section 273d(a), or felony child abuse in violation of Penal Code section 273a(a) was committed;

"2. The defendant aided and abetted that crime;

"3. A coparticipant, during the commission of that target crime of inflicting physical punishment on a child (PC 273d(a)) or felony child abuse (PC 273a(a)), committed the charged crime of murder or the lesser crime of involuntary manslaughter, or assault on a child resulting in death;

8

"AND

"4. The commission of the crime of murder, or the lesser offense of involuntary manslaughter, or assault on a child resulting in death was a natural and probable consequence of the commission of the infliction of physical punishment on a child or felony child abuse.

"A *coparticipant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder, or the lesser offense of involuntary manslaughter, or the assault on a child resulting in death was committed for a reason independent of the common plan to commit the infliction of physical punishment on a child or felony child abuse, then the commission of murder or the lesser offense of involuntary manslaughter, or assault on a child resulting in death was not a natural and probable consequence of infliction of physical punishment on a child or felony child abuse.

"To decide whether crime of murder or the lesser offense of involuntary manslaughter, or assault on a child resulting in death was committed, please refer to the separate instructions that I will give or have given you on those crimes.

"The People are alleging that the defendant originally intended to aid and abet either inflicting physical punishment on a child or felony child abuse.

"The defendant is guilty of murder or the lesser offense of involuntary manslaughter, or assault on a child resulting in death, if you decide that the defendant aided and abetted one of these crimes and that murder or the lesser offense of involuntary manslaughter or assault on a child resulting in death was the natural and probable result of one of these crimes. However, you do not need to agree about which of these two crimes the defendant aided and abetted.

9

"In determining whether a consequence is natural and probable, you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected was likely to occur."

In January 2008, the jury found the defendant not guilty of first-degree murder, but guilty of the lesser included offense of second-degree murder under section 187, subdivision (a).

The jury also found the defendant guilty of child abuse homicide.

On February 21, 2008, the trial court sentenced the defendant to 15 years to life on the second-degree murder conviction, but it stayed the sentence under section 654. The court sentenced the defendant to 25 years to life on the child abuse homicide.

Balbuena's jury also convicted her of murder, but in the first rather than the second degree. (See *Morris I, supra,* (Oct. 5, 2009, No. C058388).)

On appeal, the defendant challenged the trial court's use of CALCRIM No. 403, which "allowed the jury to convict him of murder as a natural and probable consequence of aiding and abetting felony child abuse." (*Morris I, supra,* (Oct. 5, 2009, No. C058388).) We affirmed the trial court's judgment on appeal. (*Ibid.*)

Senate Bill No. 1437 (2017-2018 Reg. Sess.)

In 2018, the Legislature passed and the Governor signed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) (Senate Bill 1437), amending sections 188 and 189 regarding the elements of murder, and adding section 1170.95 (*id.* at §§ 2-4). Section 1170.95 has since been renumbered to section 1172.6, and we refer to it by this number throughout the text of this decision. (See Stats. 2022, ch. 58, § 10.)

In passing Senate Bill 1437, the Legislature found and declared that "[t]here [was] a need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, §1, subd. (b).) It also found that "[r]eform [was] needed in California to limit convictions and subsequent sentencing so

10

that the law of California fairly addresses the culpability of the individual and assists in the reduction of prison overcrowding, which partially results from lengthy sentences that are not commensurate with the culpability of the individual." (*Id.* at § 1, subd. (e).) As such, it determined that, "[i]t [was] necessary to amend the . . . natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (*Id.* at § 1, subd. (f).)

In keeping with these findings, the Legislature amended sections 188 and 189, so that, except when a person has participated in certain forms of felony murder, which are not at issue here, "a conviction for murder requires that a person act with malice aforethought. A person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (*Id.* at § 1, subd. (g).) The amended version of section 188, subdivision (a)(3), provides, "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime."

Notably, for our purposes, Senate Bill 1437 eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Lopez, supra,* 51 Cal.App.5th at p. 597; see also § 188, subd. (a)(3).) "[U]nder the natural and probable consequences doctrine, an aider and abettor" can be found guilty not only of a crime they intended to aid and abet, but also for any other offense that was a natural and probable consequence of the crime they aided and abetted. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) Thus, a person who aided and abetted another "only [in] an intended assault" in which a murder resulted could be found guilty of the resulting murder, "even if unintended, if it [was] a natural and probable consequence of the intended assault." (*Ibid.*)

11

As added by Senate Bill 1437, section 1172.6 provides a mechanism for persons who had been previously "convicted of felony murder or murder under a natural and probable consequences theory" to seek to have their "murder conviction vacated and to be resentenced on any remaining counts." (See Stats. 2018, ch. 1015, § 4, enacting § 1170.95, subd. (a).) Under the statute, a person convicted of felony murder or murder under the natural and probable consequences doctrine would first file a petition with the court that had sentenced the petitioner, submitting a declaration stating why the petitioner believed they qualified for relief under the new and amended statutes. (See *id.*, enacting § 1170.95, subd. (b)(1)(A).) The petitioner could also request the appointment of counsel for the proceedings. (*Id.*, enacting § 1170.95, subd. (b)(1)(C).) The court would then appoint counsel for the petitioner, if requested; the People would be required to file a response to the petition; and the petitioner would be given the opportunity to reply to the response. (*Id.*, enacting § 1170.95, subd. (c).) If the court concluded the petitioner had made a prima facia showing that they were entitled to relief, the court would then need to issue an order to show cause. (*Ibid.*)

At the order to show cause hearing regarding whether to vacate the conviction and recall the sentence, the People would have the burden to prove beyond a reasonable doubt that the petitioner was not eligible for resentencing. (See Stats. 2018, ch. 1015, § 4, enacting § 1170.95. subd. (d)(3).) If the People failed to meet their burden, the prior conviction and any enhancements would need to be vacated, and the defendant resentenced on the remaining charges. (*Id.*, enacting § 1170.95, subd. (d)(3).) "If petitioner [was] entitled to relief pursuant to this section, murder was charged generically, and the target offense was not charged, the petitioner's conviction [would] be redesignated as the target offense or underlying felony for resentencing purposes." (*Id.*, enacting § 1170.95, subd. (e).)

12

The statute required the trial court to award the petitioner "credit for time served" if it resentenced the petitioner. (See Stats. 2018, ch. 1015, § 4, enacting § 1170.95, subd. (g).)

Post-Conviction Proceedings After the Effective Date of Senate Bill No. 1437 and before the Effective Date of Senate Bill No. 775

In January 2019, the defendant filed a petition for resentencing under section 1172.6. In a declaration accompanying the petition, the defendant declared that he was convicted of second-degree murder under the natural and probable consequences doctrine or the felony murder doctrine, and he could not be convicted of second-degree murder because of the changes to sections 188 and 189. In his declaration, the defendant requested that the court appoint counsel to him during the resentencing process. In the petition, the defendant argued he could not be convicted of first- or second-degree murder under the changes to sections 188 and 189 made by Senate Bill 1437.

After an initial review of the petition, the trial court issued an order to appoint counsel for the defendant, for the People to respond to the petition, and for the defendant's counsel to file a reply to that response on the defendant's behalf.

In July 2021, following regular and special briefing by the parties in the prima facia review phase, the trial court issued an order to show cause.

Passage of Senate Bill No. 775 (2021-2022 Reg. Sess.)

While the post-conviction proceedings on the defendant's petition for resentencing were pending in the trial court, the Legislature passed and the Governor signed Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 551) (Senate Bill 775), amending section 1172.6 (then section 1170.95) (*id.* at § 2).

The Legislative Counsel's Digest states the amendment "would expand the authorization to allow a person . . . who was convicted of manslaughter when the prosecution was allowed to proceed on a theory of . . . murder under the natural and

13

probable consequences doctrine, to apply to have their sentence vacated and be resentenced if, among other things, the complaint, information, or indictment was filed to allow the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine." (See Stats. 2021, ch. 551, accompanying Legislative Counsel's Digest.)

In passing the amendment, the Legislature declared that the amendment, "[c]larifies that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (See Stats. 2021, ch. 551, at § 1, subd. (a).)

Accordingly, the amended version of section 1172.6, allows "[a] person convicted of . . . manslaughter" to "file a petition with the court that sentenced the petitioner to have the petitioner's . . . manslaughter conviction vacated and to be resentenced" if "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder. [¶] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (*Id.* at § 2, amending § 1170.95, subd. (a).)

The amendment added some clarifying language regarding procedural details, but it kept the same basic procedure for persons with prior convictions who wished to seek to

have their convictions vacated and to be resentenced.  (See, generally, Stats. 2021, ch. 551, at § 2.)

### Proceedings Post January 1, 2022

#### OSC Briefing and Argument

The briefing filed by the People on the order to show cause focuses on why the People believed they had proven the defendant's guilt on the murder count as either a direct aider and abettor or as a direct perpetrator acting with implied malice.  The brief does not contain an argument about the child abuse homicide conviction.

In its briefing, the defense does not mention the child abuse homicide conviction.  The defense's argument was that the evidence did not support a second-degree murder conviction.  The defendant concluded his brief saying, "the Petitioner respectfully requests the court to vacate his murder conviction and resentence him based on the lesser related crime of child abuse" under section 273d.

The court held a hearing on the order to show cause on April 8, 2022.  At the hearing, the parties' arguments were regarding whether the second-degree murder conviction was supported by the evidence; the child abuse homicide conviction was not at issue.  The defense urged the trial court to resentence the defendant to the lesser charge of felony child abuse on the murder count.

#### Order Granting Petition

On September 28, 2022, the trial court issued an order granting the petition.

Much like the arguments the parties submitted for the order to show cause hearing, the trial court's order considered only if the defendant was entitled to resentencing on the murder conviction.  The trial court framed its order by stating, "a jury convicted petitioner . . . of second[-]degree murder (Pen. Code, § 187)[] and assault on a child under 8 years of age causing death (§ 273ab).  In coming to its verdict, the jury had the option of finding the petitioner guilty of murder as the perpetrator, an aider and abettor[,]

15

or under the natural and probable consequences theory. However, under section 1172.6, petitioner is entitled to resentencing on his murder conviction unless the evidence convinces the Court beyond a reasonable doubt that petitioner is guilty of murder because he was the actual killer or because he aided and abetted Balbuena's lethal conduct."

Likewise, in its analysis of Senate Bill 1437, the trial court began by explaining that the statute had "eliminated natural and probable consequences liability for murder as it applies to aiding and abetting, and limited the scope of the felony-murder rule. . . . Senate Bill 1437 also added section [1172.6], which creates a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." The court then considered the parties arguments regarding whether the evidence supported a finding that the defendant was guilty of murder by aiding and abetting or implied malice. Having concluded the evidence was insufficient to prove beyond a reasonable doubt that the defendant was guilty of murder because he was the actual killer or because he aided and abetted Balbuena's lethal conduct, the trial court granted the petition. In its disposition, the court stated that at the resentencing hearing, it would "redesignate petitioner's murder conviction as the target offense or underlying felony." Again, this analysis and conclusion lacked any consideration of the continuing viability of defendant's child abuse homicide conviction under Senate Bill 1437 and Senate Bill 775.

The People filed a motion for reconsideration, which the trial court denied.

Resentencing

The trial court held a resentencing hearing on November 18, 2022.

At the resentencing hearing, defense counsel argued, "I believe the legislative intent of Senate Bill 1437 and its amendments is expressed pretty clearly . . . when the legislature says it's directly addressing the problem of over-lengthy sentences and prison overcrowding in situations where the person did not have malice or basically met the

16

requirements that are set forth under 1437 and its subsequent amendments." Having stated what it believed was the Legislature's intention in passing Senate Bill 1437, the defense argued, that in view of this intention, "the Court should look at the sentence in this case in which, actually, Mr. Morris's sentence for murder is stayed by the trial court. And he was sentenced to 25 years to life, ten years more, as a minimum, than the murder count would have carried if he had been sentenced directly on that, and recognize that the legislature . . . implicitly doesn't address situations such as a [section 273ab] conviction, and we would ask the Court to resentence Mr. Morris on both counts. [¶] I recognize so far there has been no case law to support that. The exact letter of the law, even after the enactment of [Senate Bill] 775 in the effective date of January [2022] does not . . . have that language. But it is implicit in the legislative intent of 1437. [¶] So my request is to ask the Court to resentence Mr. Morris on one count of felony child abuse, 273, and one count of" section 245 "assault with force likely to create bodily injury."

The People argued the relief the defense was requesting, with respect to resentencing the defendant on the child abuse homicide count, was not supported by the statute or the declarations regarding the Legislature's intent in passing Senate Bill 1437 and Senate Bill 775. They observed that the statutes only supply relief for convictions of murder, attempted murder, or manslaughter.

The court denied the defendant's request to extend section 1172.6 relief to the child abuse homicide conviction, saying, "[t]here's just no statutory authority for the Court to do so."

The court stated that if it had the discretion to somehow change or lessen the child abuse homicide conviction and sentence, it would not, noting the underlying crime at issue here was "heinous."

The court redesignated the second-degree murder conviction as a conviction for child endangerment in violation of section 273a, subdivision (a), and imposed a four-year

17

sentence for the offense, but stayed it under section 654.  It left unchanged the child abuse homicide conviction and sentence.

DISCUSSION

I

*Section 273ab and Manslaughter*

In his first argument, the defendant claims the trial court ought to have reconsidered his child abuse homicide conviction because it is a type of manslaughter. This argument is unpersuasive.  A child abuse homicide conviction is not within the scope of convictions defendants can ask to have vacated under section 1172.6.

A.      Principles and Standards of Statutory Interpretation

In making his argument, the defendant is asking us to interpret the scope and meaning of sections 273ab and 1172.6.

"When interpreting a statute, a court's role 'is to determine the Legislature's intent so as to effectuate the law's purpose.' (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [].) 'We begin as always with the statute's actual words, the "most reliable indicator" of legislative intent, "assigning them their usual and ordinary meanings, and construing them in context.  If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.  On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction.  In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy." ' (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837-838 [].)" (*Kemp v. Superior Court* (2022) 86 Cal.App.5th 981, 990-991.)

18

As an appellate court, we apply de novo review to questions of statutory interpretation.  (See *People v. Lee* (2018) 24 Cal.App.5th 50, 54.)

B.        <u>Elements</u> <u>of</u> <u>Murder</u> <u>and</u> <u>Manslaughter</u>

Murder is statutorily defined as "the unlawful killing of a human being . . .  with malice aforethought."  (§ 187, subd. (a).)  Malice is express when there is a manifest intention to kill the victim.  (§ 188, subd. (a)(1).)  "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  (§ 188, subd. (a)(2).)

Manslaughter is statutorily defined as "the unlawful killing of a human being without malice."  (§ 192.)  According to statute, voluntary manslaughter is manslaughter committed, "upon a sudden quarrel or heat of passion," and involuntary (nonvehicular) manslaughter is manslaughter committed, "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  (§ 192, subds. (a)-(b).)

" '[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.'  (*People v. Lopez* (1998) 19 Cal.4th 282, 288 [].)"  (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.)  Thus, as statutorily defined, "[v]oluntary and involuntary manslaughter are lesser included offenses of murder."  (*People v. Thomas* (2012) 53 Cal.4th 771, 813; *People v. Rios* (2000) 23 Cal.4th 450, 454 ["Manslaughter is an unlawful killing without malice, the element necessary for the greater offense of murder"]; see also *People v. Birks* (1998) 19 Cal.4th 108, 117 ["Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser"].)

C.      Elements of Child Abuse Homicide

In *Wyatt, supra,* 48 Cal.4th at page 780, our Supreme Court listed the elements of the offense of child abuse homicide under section 273ab:  "Section 273ab defines the offense of child abuse homicide.  The elements of the offense are: '(1) A person, having the care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death.'  ([*Malfavon, supra,*] 102 Cal.App.4th [at p.] 735; see *People v. Stewart* (2000) 77 Cal.App.4th 785, 794 [].)  The manifest purpose of section 273ab is 'to protect children at a young age who are particularly vulnerable.'  (*People v. Albritton* (1998) 67 Cal.App.4th 647, 660 [] (*Albritton*).)"  (*Wyatt, supra,* 48 Cal.4th at p. 780, fn. omitted.)

The Court also identified the mens rea required for a child abuse homicide conviction.  (*Wyatt, supra,* 48 Cal.4th at p. 781.)  "[A] defendant may be guilty of an assault within the meaning of section 273ab if he acts with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act.  (See [*People v. ]Williams* [(2001)] 26 Cal.4th [779,] 788[].)  The defendant, however, need not know or be subjectively aware that his act is capable of causing great bodily injury.  (*Albritton*, *supra*, 67 Cal.App.4th at pp. 658–659.)  This means the requisite mens rea may be found even when the defendant honestly believes his act is not likely to result in such injury.  (See *Williams*, at p. 788, fn. 3.)"  (*Wyatt*, at p. 781.)  Thus, as explained in *Albritton*, *supra*, 67 Cal.App.4th at pages 657-658, section 273ab "gives plain notice that *the proscribed act is an assault on a child under eight years of age with force that objectively is likely to produce great bodily injury.*"  (Italics added.)  "Only a general criminal intent to commit the proscribed act—assault on a child under eight years old with force that objectively is likely to result in great bodily injury— is required."  (*Id.* at p. 659.)

20

D.     Section 1172.6 Does Not Extend to Child Abuse Homicide

Under its plain language, section 1172.6 allows defendants to seek relief, in specified circumstances, for convictions for murder, attempted murder, and manslaughter. It does not expressly include child abuse homicide, assault, or even all crimes that might be classified as homicides.

The defendant argues that because a child abuse homicide conviction can result from an unlawful killing without malice, it meets the definition of manslaughter and must be subject to relief under the statute. This argument grossly ignores that a child abuse homicide conviction includes elements that are not necessary to secure a manslaughter conviction.[2] Specifically, a child abuse homicide conviction requires a finding that a caretaker assaulted a child under the age of eight in a manner that a reasonable person would see as likely to cause great bodily harm. (*Malfavon, supra,* 102 Cal.App.4th at p. 735.) Manslaughter does not include an element that the victim be a child or even a particularly vulnerable victim. (§ 192.) That, in this instance, it is possible the jury could have found the defendant guilty of manslaughter as well as child abuse homicide does not mean the Legislature intended to provide persons convicted of child abuse homicide— with its added element of the willful assault of a child victim (*Albritton*, *supra*, 67 Cal.App.4th at p. 658)—an avenue to vacate those convictions when it expanded section 1172.6 to include some manslaughter convictions. (See *Orlina, supra,* 73 Cal.App.4th at p. 262 [" 'Although the reason for the rule is unclear, this court has long held that multiple convictions may not be based on necessarily included offenses. [Citations.]' [Citations.] Separate convictions may 'be had for more than one offense

_____

[2] In his opening brief, the defendant cites a four-page swath of *Orlina v. Superior Court* (1999) 73 Cal.App.4th 258, 261-642 (*Orlina*), for the proposition that "section 273ab has even been held to be a '*lesser* related offense' of involuntary manslaughter." The *Orlina* opinion actually holds, "[i]nvoluntary manslaughter is a lesser related rather than a lesser included offense of the charged crime" of a section 273ab violation. (*Orlina,* at p. 262.)

21

committed by means of a single act or series of acts, where there is an element of one crime not found in the other.' [Citation.] Therefore, the result in [*Albritton*], *supra*, 67 Cal.App.4th 647 can only be justified if the crime of involuntary manslaughter contains an element different from that contained in section 273ab"]; see also *Malfavon*, *supra*, 102 Cal.App.4th at p. 743 ["[N]either murder nor child abuse homicide is a necessarily included offense within the other: Both include elements not required by the other crime."])

Though the plain language of the statute disposes of the defendant's argument, we note the Legislative history of Senate Bill 775 does nothing to help him either.

First, we observe committee and staff analyses explain that manslaughter is a lesser included offense to murder. (See Sen. Com. on Pub. Safety, Analysis on Sen. Bill No. 775 (2021-2022 Reg. Sess.) as introduced on Feb 19, 2021 (Apr. 8, 2021) p. 5.) In so doing, the analysis by the Senate Committee on Public Safety defines a " 'lesser included offense' " as "a crime that is contained within a more serious crime. Generally, the elements that must be shown to commit a lesser included offense are also included in the overall greater and more serious offense." (*Ibid.*) The committee observes, "[t]his is the case for manslaughter and attempted murder as lesser included offenses of the more serious offense of murder." (*Ibid.*)

Next, we note that the central concern the Legislature addressed when it added manslaughter to section 1172.6 was persons who had been convicted of the lesser offense to murder of manslaughter—primarily through plea agreements—when they faced prosecutions for murder under the natural and probable consequences doctrine. (See Sen. Com. on Pub. Safety, Analysis on Sen. Bill 775, *supra*, at p. 3; Sen. Com. on Appropriations, Analysis of Sen. Bill 775 (2021-2022 Reg. Sess.) as introduced on Feb. 19, 2021 (Apr. 30, 2021) p. 3; Sen. Rules Com., Off. of Sen. Floor Analysis, Unfinished Business analysis of Sen. Bill 775 (2021-2022 Reg. Sess.) as amended Sept. 1, 2021 (Sept. 10, 2021) p. 6.)

22

Indeed, some of the analysis quotes the bill's author as stating that Senate Bill 1437 was meant to allow, " 'a pathway for people who took plea deals to lesser charges, such as manslaughter to apply for resentencing.' " (See, e.g., Assem, Com. on Pub. Safety, Analysis of Sen. Bill 775 (2021-2022 Reg. Sess.) as amended July 6, 2021 (July 12, 2021) p. 3.)  And, the Assembly Committee on Public Safety specifically identified *People v. Flores* (2020) 44 Cal.App.5th 985 and *People v. Cervantes* (2020) 44 Cal.App.5th 884 (*Cervantes*) as the types of cases the Legislature sought to address when drafting Senate Bill 775.  (Assem, Com. on Pub. Safety, Analysis of Sen. Bill 775, *supra*, pp. 3, 6-7.)  In *Flores*, *supra*, 44 Cal.App.5th at page 989, the defendant was charged with murder, but pleaded guilty to the lesser included offense of voluntary manslaughter.  After the passage of Senate Bill 1437, she petitioned to have her conviction vacated and to be resentenced under section 1172.6.  (*Id.* at p. 990.)  The trial court denied her petition on the grounds that the resentencing provision only applied to persons convicted of murder, not manslaughter.  (*Id.* at p. 989.)  The court of appeal agreed and affirmed the trial court's decision, reasoning that under the plain language of section 1172.6, it only applied to persons convicted of murder.  (*Id.* at pp. 992-993.)  Similarly, in *Cervantes*, *supra*, 44 Cal.App.5th at page 887, in 2012, the defendant had been charged with murder and had entered a no contest plea to voluntary manslaughter. Following the passage of Senate Bill 1437, he filed a petition for relief under section 1172.6, and the trial court denied his request, ruling he was not eligible for relief under the statute.  (*Ibid.*)  The court of appeal affirmed the trial court's order, noting the plain language of the statute "unequivocally applies to murder convictions" and makes "no reference to the crime of voluntary manslaughter." (*Id.* at p. 887.)

In short, the Legislative history suggests that a mechanism for vacating some manslaughter convictions was included in Senate Bill 775 because, as a lesser offense to murder, a manslaughter conviction was often secured through pleas in murder prosecutions under the natural and probable consequence (or felony murder) doctrine.

However, child abuse homicide is not a lesser included offense of murder or manslaughter. (See *Malfavon*, *supra*, 102 Cal.App.4th at p. 743.) It contains elements not required to find a person guilty of murder or manslaughter, and the Legislative history regarding adding lesser included offenses to murder to section 1172.6 does not support a finding that the Legislature also intended to include crimes that have elements that are not required to obtain a conviction for murder.

## II

### *Equal Protection and Due Process Claims*

The defendant argues that if child abuse homicide convictions are excluded from the scope of convictions eligible for section 1172.6 relief, the law violates the equal protection and substantive due process principles. This argument lacks merit.

### A.     Equal Protection

"The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws. To succeed on an equal protection claim, appellants must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 195.)

"The principles by which we evaluate a claimed equal protection violation are well established. Where there are no suspect classes or fundamental rights at issue, we apply rational basis review. (*People v. Chatman* (2018) 4 Cal.5th 277, 288–289 [] (*Chatman*).) Rational basis review 'sets a high bar before a law is deemed to lack even the minimal rationality necessary for it to survive constitutional scrutiny. Coupled with a rebuttable presumption that legislation is constitutional, this high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair.' (*Id.* at p. 289.)

24

" 'In order to decide whether a statutory distinction is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection, we typically ask two questions. We first ask whether the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner. [Citations.] If we deem the groups at issue similarly situated in all material respects, we consider whether the challenged classification ultimately bears a rational relationship to a legitimate state purpose. [Citation.] A classification in a statute is presumed rational until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable. [Citations.] . . . [Citation.] Nor does the logic behind a potential justification need to be persuasive or sensible—rather than simply rational.' (*Chatman, supra,* 4 Cal.5th 277, 289.) 'A law will be upheld as long as a court can "speculat[e]" any rational reason for the resulting differential treatment, regardless of whether the "speculation has 'a foundation in the record,' " regardless of whether it can be "empirically substantiated," and regardless of whether the Legislature ever "articulated" that reason when enacting the law.' (*People v. Love*[ (2020)] 55 Cal.App.5th [273,] 287, quoting *People v. Turnage* (2012) 55 Cal.4th 62, 74 [].) As a result, '[t]o mount a successful rational basis challenge, a party must " 'negative every conceivable basis' " that might support the disputed statutory disparity.' (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 [].)" (*People v. Morales* (2021) 67 Cal.App.5th 326, 343-344.) We review claims that a statute violates equal protection de novo. (*Id.* at p. 345.)

Here, persons who are convicted of child abuse homicide are not per se similarly situated as those convicted of murder, attempted murder, or manslaughter. As discussed above, child abuse homicide is a different crime that includes elements not included in murder or manslaughter. " ' "Persons convicted of different crimes are not similarly situated for equal protection purposes." [Citations.] "It is one thing to hold, as did [*People v. Olivas* (1976) 17 Cal.3d 236 []] that persons convicted of the same crime cannot be treated differently. It is quite another to hold that persons convicted of

25

different crimes must be treated equally." (*Smith v. Municipal Court* (1978) 78 Cal.App.3d 592, 601 [].)' (*People v. Jacobs* (1984) 157 Cal.App.3d 797, 801-803 [].)" (*People v. Barrera* (1993) 14 Cal.App.4th 1555, 1565.) Here, for example, persons who are found guilty of a child abuse homicide are necessarily guilty of a crime that involves a reckless assault on a person under the age of 8 (see *Orlina, supra,* 73 Cal.App.4th at p. 261), while persons convicted of murder or manslaughter are not necessarily guilty of the same (see *Malfavon*, *supra*, 102 Cal.App.4th at p. 743).

The defendant's attempt to blur the lines between these two crimes by pointing out that, in this instance, the person convicted of second-degree murder and the person convicted of child abuse homicide was the same person, is not persuasive. As sentencing under section 654 reflects, one action can lead to convictions of multiple crimes with non-overlapping elements, and that those crimes with their different elements will impose different penalties. Having a defendant serve the sentence for the crime with the longest sentence in that scenario does not offend equal protection.

Additionally, even if we were to accept that persons guilty of murder and manslaughter are generally similarly situated to those guilty of child abuse homicide, there is a rational basis for applying a heightened punishment to crimes that result in the death of a child. As the Fourth District Court of Appeal observed in *Albritton, supra,* 67 Cal.App.4th at page 660, "[c]onsidering the purpose of the statute—to protect children at a young age who are particularly vulnerable—there can be no dispute of the gravity of the governmental interest involved. As our Supreme Court put it, it is 'AN INTEREST OF UNPARALLELED SIGNIFICANCE: the protection of the very lives of California's children, upon whose "healthy, well-rounded growth . . . into full maturity as citizens" our "democratic society rests, for its continuance . . . ." ' (*Walker v. Superior Court* (1988) 47 Cal. 3d 112, 139 [].)" (*Albritton, supra,* 67 Cal.App.4th at p. 660.) Given this heightened interest, it is rational that our Legislature would treat a child abuse homicide conviction obtained under a natural and probable consequences theory more harshly than

26

other convictions for crimes resulting in death. Allowing past child abuse homicide convictions obtained under the natural and probable consequences theory to stand reflects an understanding about the particularly vulnerable nature of the victims involved. Excluding child abuse homicide convictions from the reach of section 1172.6 does not offend equal protection.

B.    Due Process

" '[S]ubstantive due process requires a rational relationship between the objectives of a legislative enactment and the methods chosen to achieve those objectives.' (*California Rifle & Pistol Assn. v. City of West Hollywood* (1988) 66 Cal.App.4th 1302, 1330 [].)" (*Cervantes, supra,* 44 Cal.App.5th at p. 889.) Here, the objectives of Senate Bill 1437 included ensuring that "*murder* liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, §1, subd. (f), emphasis added.) Senate Bill 775 was meant, in part, to expand the relief available to persons convicted of manslaughter when the prosecution had been able to proceed under a theory that the person was guilty of murder under the natural and probable consequences doctrine. (See Stats. 2021, ch. 551, accompanying Legislative Counsel's Digest.)

Adopting a statute that excludes child abuse homicide convictions from the scope of convictions that can be vacated with a section 1172.6 petition is a rational means to achieve that objective. Again, child abuse homicide has elements that are in addition to and different from the elements that comprise murder and manslaughter. Those elements deal, in large part, with the vulnerable nature of the victims involved and a heightened need to offer that class of victims—young children—protection.

27

*Cruel and/or Unusual Punishment Claims*

The defendant argues that his sentence is cruel or unusual, in violation of the Eighth Amendment of the United States Constitution and article 1, section 17 of the California Constitution.  We disagree.

A.      Standard and Principles of Review

"Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment."  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496 (*Martinez*).)

In conducting this review, we are mindful that, "[t]he doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature.  Perhaps foremost among these are the definition of crime and the determination of punishment."  (*People v. Wingo* (1975) 14 Cal.3d 169, 174; see also *Rummel v. Estelle* (1980) 445 U.S. 263, 274, fn. omitted ["one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative"].)

The judiciary "should not interfere in" the Legislative process of defining crimes and fixing punishments "unless a statute prescribes a penalty 'out of all proportion to the offense' (*Robinson v. California* (1962) [] 370 U.S. 660, 676 [] (concurring opinion of Douglas, J.); *In re Finley* (1905) [] 1 Cal. App. 198, 202)."  (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).)  Under this standard, punishment must not be so excessive that it transgresses the limits of civilized standards.  (*Ibid.*)

Thus, "[o]nly in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*Martinez, supra*, 76 Cal.App.4th at p. 494.)

### B.      Analysis Under Article 1, Section 17 of the California Constitution

"Under article I, section 17 of the California Constitution a punishment is cruel or unusual if in the abstract or as applied to the particular defendant ' "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' (*People v. Dillon* (1983) 34 Cal.3d 441, 478 [].)" (*People v. Lewis* (2004) 120 Cal.App.4th 837, 855 (*Lewis*); see also *Lynch, supra*, 8 Cal.3d at p. 424, fn. omitted ["A] punishment may violate . . . the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity"].)

The Fourth District Court of Appeal's decision in *Lewis, supra,* 120 Cal.App.4th 837 provides persuasive guidance and a useful framework to analyze the defendant's claim that the punishment for a child abuse homicide conviction violates the California Constitution's prohibition on the imposition of cruel or unusual punishment as on its face and as it applies to him.

### 1.      Abstract Analysis

The *Lewis* court first considered if the punishment for a section 273ab offense was disproportionate to the crime. (*Lewis, supra,* 120 Cal.App.4th at p. 855.) It stated that to make this determination "we focus on three issues: (1) the nature of the offense, (2) a comparison with the punishment imposed for more serious crimes in California and (3) a comparison with the punishment imposed for the same or similar offenses in other jurisdictions. ([*Lynch, supra,*] 8 Cal.3d [at pp.] 425–427 []; [*Norman*], *supra*, 109 Cal.App.4th at p. 230.)" (*Lewis, supra,* 120 Cal.App.4th at p. 855.)

On the first prong, the court concluded, "Section 273ab describes a very serious offense. Not only does the crime require the killing of an extremely vulnerable child, it requires an assaultive act of great violence by one charged with the child's care." (*Lewis, supra,* 120 Cal.App.4th at p. 855.) This remains true.

On the second prong, the court considered the defendant's argument that "his punishment [was] cruel or unusual" because it was "the same as the punishment for first degree murder when, he contends, his offense was less serious and more like assault by means of force likely to cause great bodily injury (§ 245, subd. (a)) or involuntary manslaughter (§ 192, subd. (b))." (*Lewis*, *supra*, 120 Cal.App.4th at pp. 855-856.) The court rejected this argument on the grounds that "[w]hile it is true section 273ab does not require an intent to kill or any other form of malice aforethought, neither does first degree felony murder [citation] and neither does the three strikes law." (*Id.* at p. 856.)

The defendant argues the *Lewis* opinion's comparison with first degree murder is no longer apt, because Senate Bill 1437 changed the law regarding the applicable mens rea required to be found guilty of murder. He also claims the application of the three strikes law is inapt because that is not an offense but a sentencing regime. Defendant urges us to now compare the punishment for child abuse homicide to the lesser punishment for second-degree murder. He claims second-degree murder is a "more serious offense" because it now requires a finding of malice and child abuse homicide is more akin to manslaughter.

The defendant's narrow focus on the malice requirement in comparing these punishments ignores critical aspects of child abuse homicide convictions: they require a reckless assault on a young child by a caretaker, resulting in the child's death. (See *Orlina, supra,* 73 Cal.App.4th at p. 261.) While murder, manslaughter, and child abuse homicide may all overlap in that they cause the death of the victim, " '[e]vils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think.' " (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1385,

quoting *Williamson v. Lee Optical Co.* (1955) 348 U.S. 483, 489.) Our courts have recognized that the protection of vulnerable children is of unparalleled significance. (*Albritton, supra,* 67 Cal.App.4th at p. 660.) Given this, the punishment prescribed under section 273ab, subdivision (a), survives an analysis under the second prong we apply when asking if a punishment runs afoul of our state's constitutional prohibition on cruel or unusual punishment.

The defendant's efforts to convince us that a section 273ab, subdivision (a), punishment is cruel or unusual in the abstract when considered under the third prong, a cross-jurisdictional analysis, also fails. None of the statutes identified defines an identical crime with a lesser punishment,[3] and, to the extent punishments are lesser, the difference is not such that we are forced to conclude the punishment here is "so disproportionate to the crime for which it is inflicted that it *shocks the conscience and offends fundamental notions of human dignity.*" (See *Lynch*, *supra*, 8 Cal.3d at p. 424, emphasis added, fn. omitted.)

For example, defendant cites South Carolina case law, *State v. Thompson* (Ct.App. 2017) 420 S.C. 192, 206 [802 S.E.2d 623], in an effort to convince the court that child abuse homicide statues that carry like or greater penalties require a greater mens rea of the defendant. Specifically, defendant zeroes in on the language that quotes the South Carolina child abuse homicide statute as saying, " 'A person is guilty of [child abuse homicide] if the person causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life' . . . ." (*State v. Thompson, supra,* 420 S.C. at p. 207.) Defendant emphasizes the use of the phrase "extreme indifference to human

---

[3] Indeed, the defendant has failed to identify the possible sentence range for the violations of many of the other state's statutes that he cites. Without this information, it is difficult to see why he thinks these comparisons render the punishment here shocking.

life." But this ignores differences between the statutes where the South Caroline crime is arguably less serious than a section 273ab, subdivision (a), violation. For example, the South Carolina statute (1) applies to victims up to the age of 11 where section 273ab applies to victims up to the age of eight; (2) is not limited to perpetrators who are caretakers where the California statute requires a caretaker relationship; and (3) can be triggered by either "an act or omission by any person which causes harm to the child's physical health or welfare," where section 273ab, subdivision (a), requires the intentional act of an assault. (S.C. Code Ann. § 16-3-85.) These differences, and the ways in which the California statute arguably defines a more "serious" crime make the South Carolina statute an inapt comparison for finding section 273ab, subdivision (a)'s punishment cruel and unusual under our constitution.

As another example, the child abuse homicide statute at issue in *State v. Killpack*, 2008 UT 49 [191 P.3d 17], P1, applied to victims up to the age of 18. (Utah Code Ann., § 76-5-208, subd. (2)(a)(i); see also 2000 Ut. ALS 125, 2000 Utah Laws 125, 2000 Ut. Ch. 125, 2000 Ut. HB 56 [reflecting the age of 18 was added to the statute in 2000].) It is not shocking that California would apply a harsher penalty under section 273ab, subdivision (a).

The punishment for child abuse homicide is not cruel or unusual in the abstract.

### 2. As Applied Analysis

"While a punishment may not be cruel and unusual in the abstract, it may be unconstitutional as applied to a particular defendant. The task is to decide if the penalty imposed is grossly disproportionate to the defendant's culpability. Stated another way, does 'the punishment *shock[] the conscience and offend[] fundamental notions of human dignity*.' (*People v. Cox* (2003) 30 Cal.4th 916, 970 [].) In making this inquiry courts consider the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed,

the consequences of the act, the defendant's age and history of criminality and the defendant's mental capabilities. (*Ibid.*)" (*Lewis, supra,* 120 Cal.App.4th at p. 856, italics added.)

Here, as we discussed before presenting the general background facts for this decision, is where the parties' lack of more detailed reference to the trial court's record reveals itself to be most problematic. Because, in performing this piece of our analysis, "the underlying disputed facts *must be viewed in the light most favorable to the judgment.*" (*Martinez, supra,* 76 Cal.App.4th at p. 496, italics added.) While the trial court was not asked to, and therefore did not explicitly opine on whether this punishment was cruel or unusual given the evidence before it, it did at least provide us some insight into its feelings on the matter when it describes the underlying crime here as "heinous," and said it would not reduce the sentence on the child abuse homicide conviction if it had the discretion to do so.

Even on the limited universe of facts contained in the statement of facts contained in the trial court's order on the petition, we conclude the sentence here does not shock the conscience of offend notions of human dignity. The victim of this crime was three years old. He suffered two fatal injuries. At a minimum, the defendant admitted to—in the hours leading up to the victim's death—making the victim jump up and down when he didn't fall asleep and spanking KC with a spatula.

Things do not improve for the defendant if one looks at even a small piece of the evidence before the trial court when it considered the petition.

In an interview with detectives, defendant reported making KC jump up and down to wear him out for 15-30 minutes. The defendant told detectives that when KC still did not fall asleep, the defendant had KC stand with his arms out for 30 minutes. While at first the defendant told detectives he and Balbuena would leave her children alone in the apartment for shorter periods of time, he eventually admitted to detectives that he and

Balbuena would leave the children for around eight hours a day, and he said he lied about it because he did not want Balbuena to lose her kids.

Preschool teachers who had taught KC reported seeing various injuries on KC in the few months before his death.

In short, the defendant's own admissions to detectives and the testimony of disinterested witnesses support a conclusion that, at a minimum, the defendant was aware that KC—a *three year old child who suffered two fatal injuries*—was living in an environment that was putting him physically at risk, that he contributed to an environment that normalized the harsh treatment of KC, and that he minimized or lied about that environment to protect KC's abuser (Balbuena or himself) from the consequences of that abuse.

Looking at the jury instructions used in the trial, if the jury found defendant was guilty under the natural and probable consequences doctrine, we presume it found that the child abuse homicide was not "committed for a reason independent of the common plan" with Balbuena "to commit the infliction of physical punishment on a child or felony child abuse." " '[w]e presume the jury understood and followed the instruction.' (*People v. Homick* (2012) 55 Cal.4th 816, 873, [].)" (*People v. Sanchez* (2019) 7 Cal.5th 14, 55.) That is, the jury did not find the defendant was haplessly unaware that Balbuena was physically punishing or abusing KC, but that the defendant engaged in a common plan to allow that abuse to happen.

The defendant's punishment is not cruel or unusual as applied to the defendant.

C.     <u>Analysis</u> <u>Under</u> <u>the</u> <u>Eighth</u> <u>Amendment</u> <u>of</u> <u>the</u> <u>United</u> <u>States</u> <u>Constitution</u>

In order to find a punishment violates the Eighth Amendment, we must make a finding of " 'gross disproportionality' between the offense and the offender and the punishment." (*Norman*, *supra*, 109 Cal.App.4th at p. 230.) In *Norman*, *supra*, when considering an Eight Amendment challenge to section 273ab, this court noted the U.S.

Supreme Court has upheld life sentences for nonviolent crimes—e.g., in *Harmelin v. Michigan* (1991) 501 U.S. 957, 961, 966, the Court affirmed a sentence of life without the possibility of parole for a defendant convicted of possession of a large amount of cocaine. The court then stated, "[s]ince a sentence of life without parole is not cruel and unusual for certain nonviolent offenses, then, a fortiori, a sentence of 25 years to life is not cruel and unusual for the death of a child under age eight." (*Norman*, *supra*, 109 Cal.App.4th at p. 230.)

In *Lewis, supra,* 120 Cal.App.4th at page 855, the fourth district court of appeal quoted *Norman* with approval when it upheld a section 273ab punishment in the face of an Eighth Amendment challenge.

While the defendant does make some arguments about the continuing validity of *Lewis*, those arguments are regarding portions of the *Lewis* decision that discuss whether section 273ab imposes a cruel or unusual punishment under the California Constitution when considered under the factors identified in *Lynch*. In other words, the defendant has not made any meaningful argument as to why this court should not apply the Eighth Amendment analysis offered in *Norman* and echoed in *Lewis* to find his Eighth Amendment challenge lacks merit. Additionally, we see no reason to depart from *Norman* and *Lewis* on this point.

IV

*The Booking and Classification Fees Should Be Vacated*

In 2008, defendant was ordered to pay a main jail booking fee of $242.29 and a main jail classification fee of $27.22. According to the minute order from the November 17, 2022, resentencing hearing, the trial court left the booking and classification fees imposed in the resentencing. In his opening brief, the defendant argues that when the trial court resentenced him it needed to vacate the booking and classification fees, *and* it needed to order he be reimbursed anything he previously paid.

35

While we agree with his argument regarding vacating the fees, defendant has failed to sufficiently develop the record and his argument regarding reimbursement. Therefore, his request for reimbursement fails.

These booking and classification fees were imposed under the Government Code section 29550.2, subdivisions (a) and (c). Government Code section 29550.2 was repealed effective July 1, 2021. (Stats. 2020, ch. 92, § 25, amending Gov. Code, § 29550.2, subd. (d).) The repeal was accomplished by an amendment to the statute that explicitly left the statute in effect until July 1, 2021. (*Ibid.*) When the Legislature amended Government Code section 29550.2, so that it would be repealed on July 1, 2021, it also passed Government Code section 6111. (Stats. 2020, ch. 92, § 11.) Under Government Code section 6111, subdivision (a), "[o]n and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . Section . . . 29550.2 . . . is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

In response to the defendant's argument, the People agree that the order to pay classification and booking fees should be vacated, but the People do not agree that reimbursement is required, pointing to the language of Government Code section 6111, subdivision (a), which says the prior orders shall be "vacated," but says nothing about reimbursements.

The People's reading of Government Code section 6111, subdivision (a), has merit. As The Fourth District Court of Appeal stated in *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953, "[b]y specifying the precise date on which the costs that have been imposed on defendants pursuant to 'Section . . . 29550.2 . . .' become unenforceable and uncollectible, the Legislature made clear that any amounts paid prior to that time need not be vacated, regardless of whether the sentence of the person on whom the costs were imposed is final." (*Lopez-Vinck* at p. 953.)

In his Reply, the defendant counters that the operative statute vacating his sentence is section 1172.6, and not Government Code section 6111. The language the defendant highlights refers to how if a petitioner is successful under section 1172.6, the murder conviction "shall be vacated and the petitioner shall be resentenced on the remaining charges." But, even assuming that the defendant is correct in identifying which statute controls, the language in section 1172.6 says nothing about reimbursing defendants for administrative fees previously paid as part of resentencing. Similarly, the defendant has not cited any authority to support his proposition that when these fees are vacated, a court must then order any prior paid fees to be reimbursed. The only thing the cases he has cited in this argument support is the proposition that when one part of a sentence is stricken on review, on remand the trial court can engage in a resentencing on all counts on remand (*People v. Buycks* (2018) 5 Cal.5th 857, 893); and (2) "once a court has determined that a defendant is entitled to resentencing, the result is vacatur of the original sentence, whereupon the trial court may impose any appropriate sentence." (*People v. Padilla* (2022) 13 Cal.5th 152, 163.) Neither of these holdings is tantamount to a holding that once a sentence that includes a fee award is vacated any fees previously paid must be reimbursed. And the defendant makes no real effort to close that loop.

Additionally, the defendant has not pointed to any facts that show he has actually paid any of the fees previously imposed, even in the face of the People's argument that there is "no evidence that appellant paid any of the fees." Briefs must, "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal Rules of Court, rule 8.204(a)(1)C); see also Cal. Rules of Court, rule 8.360(a).) Thus, at this point, the defendant has not even demonstrated that in asking this court to consider the reimbursement issue he is asking it to actually afford him relief or merely asking a hypothetical question. This is something we avoid. (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 995 [discussing the role of ripeness and citing caselaw regarding how it prevents courts from issuing opinions that

37

are purely advisory, based on the consideration of a hypothetical set of facts, or for the sake of offering general guidance instead of resolving a specific legal dispute].)

On remand, we will direct the trial court to vacate the booking and classification fee awards. Based on the defendant's failure to sufficiently develop the facts or law regarding his demand for reimbursement of previously paid fees, we will not direct the trial court to order reimbursement.

V

*Conduct Credits*

The trial court gave the defendant a total of 7,092 days credit for time served. Of those days, 6,167 were for actual time served as of the November 17, 2022, resentencing and 925 were for "good time/work time" (behavioral credit). The 925 was reached by calculating 15 percent of the actual time served at the date of resentencing. Thus, the 925 days were not determined based exclusively on time served and the actions of the defendant while in custody before his first sentencing hearing. When defendant was first sentenced in February 2008, he was not awarded any "local conduct" credits, and he had served 810 days.

The defendant argues that the award of behavioral credit should have been left to the Department of Corrections and Rehabilitation (department) to decide. The People agree that the department is responsible for awarding conduct credits earned between the original sentencing and resentencing. Yet the People maintain that because the defendant is limited to a 15 percent conduct credit under the law, he has not identified any actual error in the trial court's calculation. In reply, the defendant argues that the error was in the court usurping the function of the department. On this point, we agree with the defendant.

Under section 4019, a defendant in custody after his arrest and prior to sentencing can receive credit against his eventual sentence for various reasons. (See also *People v.*

*Buckhalter* (2001) 26 Cal.4th 20, 30 (*Buckhalter*).) These credits are sometimes referred to as "local conduct credits." (See, e.g., *People v. Brown* (2012) 54 Cal.4th 314, 326.) At the time of initial sentencing, the trial court must calculate the exact number of days the defendant has been in custody prior to sentencing, add applicable local conduct credits earned pursuant to section 4019, and reflect the total in the abstract of judgment. (Pen. Code, § 2900.5, subds. (a) & (d); see also *Buckhalter*, *supra*, 26 Cal.4th at p. 30.)

Once a person has started serving a prison term, that person is entered into the custody of the department, and they can earn credits to shorten time served under a system that takes into consideration work performed and good behavior while in department custody. (See § 2930, et seq.; see also *Buckhalter, supra,* 26 Cal.4th at p. 31.) At this point a defendant's ability to earn local conduct credits stops. (*Buckhalter,* at pp. 33 & 40.)

It is the duty of the of the department to determine prison behavior and worktime credits once a defendant has been sentenced. (See *People v. Chew* (1985) 172 Cal.App.3d 45, 50, overruled on other grounds in *Buckhalter*, *supra*, 26 Cal.4th at p. 40 ["Other code sections (§§ 2930-2935) assign to the Director of Corrections the duty of determining prison behavior and worktime credits, including the determination of appropriate worktime credits while the defendant is away from prison awaiting resentencing"]; see also *Buckhalter*, at p. 31 ["Accrual, forfeiture, and restoration of prison worktime credits are pursuant to procedures established and administered by the Director"].) The department can also determine that previously awarded credits have been forfeited due to misconduct and restore forfeited credits. (See, e.g., §§ 2932, subd. (a), 2933, subd. (d); *Buckhalter*, at p. 31.)

As we have seen in cases where courts of appeal have remanded cases for resentencing, when an individual has already been serving a prison sentence and the sentencing court must resentence that person, the trial court must identify in the new abstract of judgment: (1) the total number of actual days served to be credited towards the

39

defendant's sentence; and (2) the local conduct credits "for the period before the original sentencing hearing." (*People v. Sek* (2022) 74 Cal.App.5th 657, 673; *Buckhalter*, *supra*, 26 Cal.4th at pp. 29-30.) However, it is the job of the department, not the court, to calculate and apply "conduct credit for time following the original sentencing hearing." (*Sek*, at p. 673; Cal. Const. art. 1, § 32, subd. (a)(2).)

Here, in calculating "good time/work time" earned over the course of all the days the defendant has been in custody—including during the time following initial sentencing and commitment to the department—the sentencing court has usurped the function of the department. (Cal. Const. art. 1, § 32, subd. (a)(2).) The result is we now have an abstract of judgment that suggests the defendant earned "local conduct" credits of 925 days, a figure that was calculated using formulas other than those provided for in section 4019 and which, if unchecked, could result in the defendant ultimately receiving local credits in excess of the amount to which he would be entitled under the law. As an award of credits beyond the jurisdiction of the trial court, the award can be corrected on remand. (See *People v. Macias* (1979) 93 Cal.App.3d 788, 792.)

## DISPOSITION

We remand to the trial court to (1) enter an order vacating the main jail booking fee of $242.29 and a main jail classification fee of $27.22; and (2) amend its award of local conduct credits so that it only takes into consideration if local conduct credits were earned prior to defendant's February 21, 2008, original sentencing.  In all other respects, we affirm.

 

_____

HULL, J.

We concur:

_____

EARL, P. J.

_____

ROBIE, J.